Suneel J. Nelson
Nevada Bar No. 12052
NELSON LAW OFFICE, LLC
1800 Calle de Vega
Las Vegas, Nevada 89102
T: (702) 506-1848
F: (702) 963-8715
suneel.nelson@gmail.com

*Attorney for Plaintiff Solomon Coleman*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| SOLOMON COLEMAN, individually, | CASE NO.: |
| Plaintiff, | |
| vs. | |
| LAS VEGAS METROPOLITAN POLICE DEPARTMENT; CHERYL HOOTEN, individually; JOSEPH LEPORE, individually; BRIAN SANTAROSSA, individually; DONALD SHANE, individually; R. TENNANT, individually; VICENTE RAMIREZ, individually; LISA LUZAICH, individually, | **COMPLAINT** *Jury trial demanded* |
| Defendants. | |

Plaintiff SOLOMON COLEMAN, by and through his attorney Suneel J. Nelson, Esq., alleges and prays as follows:

## INTRODUCTION

1.     Plaintiff SOLOMON COLEMAN ("COLEMAN"), a former black officer of the LVMPD, brings this action under 42 U.S.C. § 1983 seeking redress for profound deprivations of his constitutional rights by the Defendants.

– 1 –

2.     COLEMAN's claims arise from LVMPD's investigation of his supposed misconduct toward white women/victims while on duty—an effort led by the "Sexual Assault Detail," an all-white cabal of LVMPD sergeants and detectives individually named as defendants (i.e., "Officer Defendants"), who predetermined COLEMAN's guilt, then used every means available, including violating COLEMAN's rights under the clearly established law, to ensure his prosecution and conviction on charges for which probable cause did not exist.

3.     The Officer Defendants were motivated by racial animus due to the fact that COLEMAN is black, and therefore is a member of a protected class of persons for purposes of the Fourteenth Amendment's equal protection jurisprudence. Further, the Officer Defendants were acting in accordance with their deeply ingrained training, and widespread practices at LVDMPD that require harsh retaliation against any officer who complains about racial discrimination, or even agrees to tell what they have seen in this regard—as COLEMAN agreed to do in early 2013 when he offered to serve as a witness in support of a fellow officer's report concerning an incident involving another officer's racial discrimination.

4.     Although COLEMAN ultimately obtained a favorable termination of the criminal proceedings Defendants manufactured with the intent to deprive COLEMAN of his rights under the federal law and constitution, he has suffered immense personal and professional harm as a result of the Defendants' conduct. Therefore, COLEMAN files this action seeking redress for the harm and damages he has suffered as a consequence of the Defendants' intentional violation of his federally-protected rights.

## JURISDICTION AND VENUE

5.     The jurisdiction of this Court is invoked under 28 U.S.C. §1331 and 1343.

6.     Venue herein is proper under 28 U.S.C. §1391(b); the cause of action arose in the

– 2 –

District of Nevada, and all of the parties are employed or are located in Clark County, Nevada.

## PARTIES

7.     Plaintiff SOLOMON COLEMAN has at all times relevant hereto been a resident of the State of Nevada.

8.     Defendant LAS VEGAS METROPOLITAN POLICE DEPARTMENT ("LVMPD" or the "the Department") is the municipal police department for Clark County.  At all times relevant hereto, LVMPD was a person acting under color of state law.

9.     Defendant CHERYL HOOTEN (P #5262) was employed by LVMPD as a sergeant, HOOTEN was a person acting under color of state law.

10.     Defendant BRIAN SANTAROSSA (P #6930) was at all time relevant hereto, a detective employed by LVMPD. At all times relevant hereto, SANTAROSSA was a person acting under color of state law.

11.     Defendant VICENTE RAMIREZ (P # 4916) was at all times relevant hereto a detective employed by LVMPD.  At all times relevant hereto, RAMIREZ was a person acting under color of state law.

12.     Defendant DONALD SHANE (P# 6727) was at all times relevant hereto a detective employed by LVMPD.  At all times relevant hereto, SHANE was a person acting under color of state law.

13.     Defendant R. TENNANT (P# 6763) was at all times relevant hereto a detective employed by LVMPD.  At all times relevant hereto, TENNANT was a person acting under color of state law.

14.     Defendant JOPSEPH LEPORE (#6260) was at all times relevant hereto a sergeant employed by LVMPD.  At all times relevant hereto, LEPORE was a person acting under color

of state law.

15.     Defendant LISA LUZAICH was at all times relevant hereto a Chief Deputy District Attorney employed by the Clark County District Attorney's Office ("CCDAO"), the agency that criminally prosecuted Plaintiff.  At all times relevant hereto, LUZAICH was a person acting under color of state law.

16.     Each of the Defendants, their employees, and agents, participated personally in the unlawful conduct challenged herein and, to the extent that they did not personally participate, authorized, acquiesced, set in motion, or otherwise failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and the harm suffered by Plaintiff.  Each acted in concert with each other.  The challenged acts caused the violation of Plaintiff's rights.

17.     The identities and capacities of defendants DOES I through XX are presently unknown to Plaintiff, and upon this basis, Plaintiff sues these defendants by fictitious names. Plaintiff will amend the Complaint to substitute the true names and capacities of the DOE defendants when ascertained.  Plaintiffs are informed, believe, and thereon allege that DOES I through XX are, and were at all times relevant herein, employees and/or agents of LVMPD and are responsible for the acts and omissions complained of herein.  Defendants DOES I through XX are sued in both their official and individual capacities.

## GENERAL ALLEGATIONS

### Coleman Joins LVMPD, Where Hostility Toward Blacks is Widespread

18.     COLEMAN is a 34-year-old black male, who was born and raised in Las Vegas, Nevada where he has lived his entire life.

19.     In 2007, COLEMAN was selected to join LVMPD's police academy, the fulfillment of his lifelong career ambition.

– 4 –

20.     COLEMAN graduated from the academy at the beginning of February 2008, and was sworn as a commissioned LVMPD officer.

21.     Plaintiff was assigned to patrol duty at LVMPD's Southeast Area Command ("SEAC"), encompassing an area of 53 square miles within LVMPD's jurisdiction.

22.     Upon information and belief, COLEMAN was the only black officer—of any rank—assigned to the SEAC during his subsequent five-year tenure there.

23.     The absence of black officers from the SEAC was a particularly stark example of a department-wide trend of depressed hiring of non-white officers at LVMPD during COLEMAN's tenure with the department.

24.     Upon information and belief, in 2013—COLEMAN's last year with LVMPD—nonwhites comprised 19.1% of LVMPD's full time, commissioned officers while nonwhite comprised 54.7% of Clark County, Nevada residents for the period from 2010-13 according to U.S. Census Bureau data.

25.     Blacks comprised 7.4% of LVMPD's full time, commissioned officers, while black residents made up 9.9% of Clark County's population.

26.     LVMPD's depressed employment of black officers relative to the percentage of black citizens living in Clark County is prima facie evidence of its discriminatory employment practices under federal court precedents in the Ninth Circuit and elsewhere.

27.     LVMPD's failure to address intradepartmental racial inequality matched its indifference to long-established and widespread racially-biased policing practices, reflecting hostility of officers toward black citizens in particular.

28.     LVMPD's policymakers were well aware of widespread racially-biased policing and discriminatory treatment of black citizens by officers—problems that had been brought to its attention by credible outside law enforcement authorities for decades.

29.     In 2001, the Nevada attorney general's office issued a report on treatment of people during routine traffic stops showing that police officers in Las Vegas—including LVMPD officers—handcuffed black motorists at a far higher rate than motorists of any other races.

30.     Following the Nevada AG's report, however, there is no evidence to suggest that LVMPD took any effective steps to punish racially-discriminatory abuses by its officers, or that it provided remedial training to prevent future constitutional violations in the future.

31.     In late 2012, the widespread racially-discriminatory practices of LVMPD officers were once again brought to the department's attention, this time by the U.S. Department of Justice in a lengthy report concerning use-of-force policies, which highlighted analysis of LVMPD officer involved shootings from 2007 through 2011.

32.     The DOJ's findings summarized what LVMPD knew already: every suspect shot as the result of an officer-initiated stop was either black or Hispanic, and 90 percent of unarmed suspects shot by LVMPD officers were black or Hispanic.

33.     DOJ's report  formally recommended that the department train all of its officers in "Fair and Impartial Policing" to address the issue of unconscious bias and develop fair and impartial decision-making practices in LVMPD officers (*see* Report Recommendation 4.2.1); and, that "LVMPD should also offer advanced training in procedural justice to officers at all levels of the organization and in the academy" to "educate officers on how their actions influence those of the community they police."

34.     In a 2014 follow-up report on LVMPD's compliance prepared by the Consortium for Police Leadership in Equity at UCLA, the department's training programs regarding these topics were still in "development stages" at the time of publication.  No LVMPD officers had received any such training, and none had been scheduled.

35.     LVMPD's perfunctory planning had consisted of its decision to collapse any future training regarding "fair and impartial policing" and/or "procedural justice" into one unit so as to minimize any time officers might be obligated to devote, however.

36.     During COLEMAN's tenure at SEAC, he personally witnessed serious incidents of abuse of authority and retaliation against critics of discriminatory misconduct in policing and internal personnel practices.

37.     COLEMAN witnessed fellow officers engaging in illegal stops and searches of black and Hispanic pedestrians and motorists, and using racially-bigoted and otherwise disrespectful language towards those non-white citizens.

38.     COLEMAN also witnessed fellow officers engaging in unjustified uses of force and brutality against Hispanic and black citizens.

39.     COLEMAN further observed that supervisory officers did not investigate or punish officers involved in incidents involving racially-discriminatory policing.

### *LVMPD Permits Retaliation Against Whistleblowers*

40.     COLEMAN worked with officers whose well-intentioned attempts to bring a troubling or objectionable incident or cluster of incidents to the attention of a superior who might well be able to intervene and set right  or a cluster, of illegal and objectionable misconduct by a repeat-player whose internal compass may not be well-calibrated.

41.    A fellow officer reported an incident involving an officer's racially-motivated use of force on a child.

42.    That would-be whistleblower learned the hard way exception to the general rule that reporting on your fellow officer is forbiddenand made the error of assuming  and was sufficiently offended that he lodged a report concerning the misconduct, which had the opposite result from what he expected, and became the target of frequent hostility and retaliatory behaviors by fellow officers and superiors alike.

43.    It did not take long before the whistleblower's continued presence at the SEAC became untenable from a work perspective, given that he was isolated and could not persuade any other officer to ride with him, rendering his continued presence at SEAC untenable, and resulting in his resignation or reassignment.

44.    COLEMAN was attending a post-shift debriefing at SEAC that was interrupted by an argument between two officers which had ended with one, a white officer, pointedly telling the other, a non-white officer, to "go back to where you came from."

45.    Among those present who had heard the remark, it was not disputed that its meaning was a denigrating reference to the non-white officer's race and/or national origin.

46.    One of COLEMAN's fellow officers stated that he intended to submit a complaint to LVMPD's Office of Employment Diversity.

47.    The Office of Employment Diversity is, and was at the time of these alleged events, responsible for conducting and/or coordinating internal investigations based upon complaints based on race, religion, sex, national origin, color, age, disability, sexual orientation or political affiliation as outlined in department policy.

48.     Additionally, the Office of Employment Diversity is and was responsible developing, implementing and conducting department-wide training to all employees in employment discrimination issues.

49.     In support of his fellow officer's complaint regarding the incident, COLEMAN volunteered to be listed as a witness, and was prepared to act in that capacity in the event of an investigation by the Office of Employment Diversity.

50.     Upon information and belief, when the complaint came to the attention of Capt. Leslie Lane, who was then the SEAC's senior-most commanding officer, Capt. Lane had intervened with the Diversity Office to provide assurances that he would address the matter directly with the officers involved.

51.     Capt. Lane then did so by summoning to his office everyone who had been at the debriefing—excluding COLEMAN, notably.

52.     As relayed to COLEMAN by fellow officers who were in attendance, Capt. Lane then pledged to end the career of anyone reporting against a fellow officer in the future.

53.     Capt. Lane further described how he would make certain that any would-be whistleblower is denied promotion—now and for all time—and any other opportunities for advancement within the Department.

54.     Under Title VII's prohibition of retaliation, it is "an unlawful employment practice for an employer to discriminate against any of [its] employees... because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).

55.     Title VII therefore protects participants in an investigation, like an investigation of a fellow officer's complaint to the Office of Employment Diversity, in which COLEMAN believed his testimony might be helpful to confirm details the complaint alleged.

56.     Later in the first half of 2013, COLEMAN applied for promotion to a detective position with a "problem solving unit."

57.     Upon information and belief, COLEMAN was the best-qualified and most-experienced candidate, with better than satisfactory performance reviews throughout his then-five-year tenure, and an unblemished record of good conduct.

58.     COLEMAN's application was denied, and he did not receive any explanation why, though he hardly needed one in light of Capt. Lane's recent threat of retaliation.

59.     The detective position was instead filled by a white rookie officer still within his new-hire probationary period.

60.     The standards upon which applicants were evaluated, the identity of the decisionmaker(s) involved in the selection, and other aspects of the promotion process were opaque and subject to arbitrary interference by senior officers within the chain of command at LVMPD and/or LVMPD's final policymaker, Sheriff Doug Gillespie.

### Coleman is Targeted in a "Misconduct" Investigation

61.     On the evening of June 1, 2013, an LVMPD dispatch officer received a 9-1-1 call from a citizen ("S.B.") alleging that COLEMAN had subjected her to unwanted sexual advances on May 31, 2013 while responding to a call for service regarding a domestic disturbance at S.B.'s apartment that resulted in the arrest of her live-in boyfriend on suspicion of domestic violence.

62.     COLEMAN had indeed responded to a call for service at S.B.'s apartment the previous day and had assisted a fellow officer in the investigation of S.B.'s allegation that she had been battered by her live-in boyfriend.

63.     According to S.B., after COLEMAN's fellow officers departed the scene, he followed her to her bedroom, where he pulled down her shorts, and made o ther unwanted sexual advances toward her.

64.     S.B. claimed that, during this alleged incident, COLEMAN retrieved a "red cell phone" from his pocket" which she speculated he "could [have]" used to take photos of her surreptitiously, but clarified: "I don't know if he was taking pictures, 'cause I wasn't looking, but that—that's –I mean, he could of took pictures, 'cause he said he wanted to, so –"

65.     S.B. told the dispatch officer "I have a five-year-old son, and *he witnessed everything*…[Plaintiff] *didn't care if he was in the room watching what he was doin' to me*." (Emphasis added.)

66.     A transcript of the call reflects that, shortly after this statement is made, the following is audible on the recording: "UNKNOWN VOICE IN BACKGROUND: Liar, liar pants on _____."

67.     S.B.'s complaint was conveyed to Sgt. JOSEPH LEPORE, SEAC's patrol sergeant that evening, by the 9-1-1 dispatch operator who had first fielded the call.

68.     Sgt. LEPORE testified later that he had allegedly called S.B. on the phone to discuss her complaint then referred the matter to Sgt. CHERYL HOOTEN, the commanding officer for LVMPD's "sexual assault detail" at that time.

69.     Sgt. HOOTEN then called S.B. to arrange a meeting, and assigned Dets. SHANE and TENNANT, who were under her command at the Sexual Assault Detail, to join her.

70.     Sgt. HOOTEN assigned Det. SHANE to conduct the taped interview of S.B. in the presence of Sgt. HOOTEN and Det. TENNANT.

71.     During the taped interview, S.B. contradicted that her five-year-old son had been present for the incident and "*witnessed everything*," which is what she told the 9-1-1 dispatcher.

72.     Instead, S.B. now claimed "[*Plaintiff] was trying to shoo my son into the living room,*" he "*wasn't in the room,*" and only "*kind of witnessed a little bit*."

73.     This significant change to S.B.'s narrative was also consequential for the purpose of determining which criminal offenses should be charged against COLEMAN.

74.     S.B. also took the taped interview—her second of the evening—to clarify that she did not know whether Plaintiff took photos during the alleged incident:

Q:   …[S]o you don't know if he took pictures or not?  You're just—

A:  I don't.

Q:   —assuming.

A:  I don't.  He had his phone out but I don't [know]…

**The Officer Defendants Illegally Seize and Search Coleman's Cell Phone**

Sgt. Lepore Illegally Seizes Coleman's Cell Phone

75.     Immediately following the taped interview, Sgt. HOOTEN called Sgt. LEPORE and directed him to "get that cell phone"—*i.e.*, COLEMAN's cell phone—as soon as possible.

76.     Sgt. LEPORE accordingly devised a plan to get COLEMAN's cell phone away from him, which he prepared to execute immediately upon COLEMAN's return to the SEAC after conclusion of his shift that evening.

77.     Sgt. LEPORE could see plainly that COLEMAN's cell phone was *not* "red," which is how the citizen complainant had repeatedly described the device supposedly in

Plaintiff's hands during the incident.

78.     Sgt. LEPORE snatched COLEMAN's cell phone from his hands without warning as soon as COLEMAN returned to the SEAC at the end of his shift that evening.

79.     COLEMAN reacted by trying his cell phone back, but Sgt. LEPORE refused to relinquish it, maintaining his firm grip, and informed COLEMAN that the cell phone was "frozen"—much like a "premises freeze"—pending issuance of a search warrant.

80.     According to Sgt. LEPORE he never searched the cell phone's contents while it was in his possession.

81.     Further Sg.t LEPORE testified that he held COLEMAN's cell phone in his palm for the following hour until Det. SHANE's arrival at SEAC to retrieve it.

                    Dets. Shane and Ramirez Illegally Search Coleman's Cell Phone

82.     Upon arriving at SEAC that evening, Det. SHANE took custody of COLEMAN's cell phone from Sgt. LEPORE.

83.     While Det. SHANE was at the SEAC, face to face with COLEMAN—who had not been granted authorization to leave, and whose personal property had remained in the Officer Defendants' possession—spent several minutes trying to persuade COLEMAN to answer questions related to the Officer Defendants' investigation without consulting legal counsel.

84.     During the course of their discussion, COLEMAN asked Det. SHANE to return the cell phone do that he could use it to call his wife, who had been expecting him home hours earlier before learning from COLEMAN that he was the target of a new investigation.

85.     Det. SHANE refused to return the cell phone despite COLEMAN's request, but also took it upon himself to access and review the contents of COLEMAN's cell phone by pressing buttons on the front of the device while he peered at the screen.

86.     Det. SHANE used COLEMAN's cell phone to retrieve the phone number for COLEMAN's wife—a search COLEMAN had not given permission to SHANE to conduct.

87.     Det. SHANE took COLEMAN's cell phone back to the offices of the sexual assault detail, and supposedly deposited it in the custody of Det. SANTAROSSA.

88.     Det. SANTAROSSA, in turn, stated that he placed the cell phone into a bag labelled "evidence," which he locked within his desk drawer pending issuance of a search warrant.

89.     Yet, Det. SANTAROSSA's sworn affidavit dated June 5, 2013, states that "on 05/01/13, Det. RAMIREZ conducted an examination of the contents of Coleman's cell phone and discovered browser activity related to s several web-based photo sharing accounts."

90.     RAMIREZ's review of the contents of COLEMAN's cell phone constituted a search prior to the issuance of a search warrant in violation of the Fourth Amendment.

<u>Det. Santarossa uses Judicial Deception to Get a Warrant</u>

91.     Det. SANTAROSSA applied for a search warrant authorizing a search of the contents of COLEMAN's cell phone, submitting a sworn affidavit dated June 2, 2013 in support of his application.

92.     Det. SANTAROSSA's affidavit contained statements he knew to be false, or which he would have known were false had he not recklessly disregarded the truth, and omitted facts that were material to the determination of probable cause.

93.     Det. SANTAROSSA's false statements and material omissions included:

   a. He did not disclose that S.B. told the 9-1-1 dispatcher that her son had "*witnessed everything*," but the same evening told detectives that COLEMAN tried to "shoo" her son out of the room, and that he had only witnessed the end of the incident.

– 14 –

b.  Det. SANTAROSSA's affidavit falsely states that "*[S.B.] believed that [COLEMAN] had taken pictures of her while her pants were down*," though S.B.'s actual statements to the 9-1-1 dispatcher and to the detectives on June 1, 2013 were contrary in both word and spirit: she refused to endorse an affirmative belief as to whether COLEMAN had taken photos.

c.  He did not disclose that, contrary to S.B.'s description of a "red cell phone" in COLEMAN's possession during the alleged incident, the cell phone LEPORE seized from COLEMAN's person on June 1, 2013 was *not* red, but was mostly black with small orange accents.

78.  The affidavit did not contain true and complete factual averments sufficient to support the magistrate's finding of probable cause for issuance of the search warrant.

79.  Sgt. HOOTEN was aware of and approved the contents of Det. SANTAROSSA's affidavit, which she signed as a "witness."

<u>The Search Warrant Lacks Particularity</u>

80.  The warrant authorizing review of the contents of COLEMAN's cell phone defined the object of the search as follows:

> Any data evidence of visual depictions/representations (images and videos), digital stored records, information and data, which constitute evidence of Solomon Coleman's involvement in the planning or commission of the crime(s) of Open and Gross Lewdness between the dates of 5/31/2013 and 06/01/2013.
>
> Any data / files which would tend to establish the identity of persons in control of said data, which items of property would consist in part of and include, but not be limited to, personal pictures, documents, e-mail correspondence, bills, receipts, bank account information, software registration information, file date access information, web site account information, Internet activity information which tend to show possession, dominion and control over said device(s) / data of investigative interest.

– 15 –

Together with the aforementioned to be seized, is other indicia evidence of cellular usage and digitally stored records which would tend to establish the identity of person(s) who were in sole or joint custody of aforementioned digital storage device during the period of time between 05/31/2013 and 06/01/2013.

81. The Fourth Amendment requires that a warrant particularly describe "the place to be searched, and the person or things to be seized." U.S. Const. amend. IV.

82. Here, the warrant's first paragraph, which provides for seizure of "evidence of Solomon Coleman's involvement in the planning or commission of the crime(s) of Open and Gross Lewdness between the dates of 5/31/2013 and 06/01/2013" is arguably particularized with respect to the items to be seized.

83. Portions of the warrant authorizing seizure of "[a]ny data / files which would tend to establish the identity of persons in control of said data…" lacked sufficient particularity inasmuch as COLEMAN was in possession of the cell phone and its contents when LEPORE snatched it from his hands upon his return to SEAC on June 1, 2013.

84. which to insufficiently particularized with regard to the The identity of the person in possession of the phone and/or its contents was indisputably COLEMAN—the person from whom Sgt. LEPORE had seized it—and was never in dispute, yet the warrant authorized a review of a broad swath of data/files that would "tend to establish the identity" of persons in control of the phone and/or its contents.

85. The warrant was deficient on its face because its description of the cell phone data/files to be seized lacked particularity.

86. Further, no reasonably trained executing officer would rely upon the warrant because it was facially invalid have presumed the warrant to be valid.

<u>Forensic Data Tools Confirm the Absence of the Evidence Sought</u>

– 16 –

87.     Det. VINCENTE RAMIREZ, an LVMPD cell phone analyst, claims he received the cell phone from Det. SANTAROSSA on June 2, 2013, along with a copy of the warrant.

88.     Det. RAMIREZ used a forensic tool known as Cellebrite to make an identical copy of the data contents (i.e., a "fingerprint") of COLEMAN's cell phone.

89.     Det. RAMIREZ also used Cellebrite to generate a report cataloguing the phone's contents by file type, date/time created, and other metrics hidden in the metadata.

90.     The Cellebrite report, which is generated in the form of a .PDF file that enables review of the phone's contents apart from the underlying contents.

91.     According to the Cellebrite report, COLEMAN's cell phone did not contain any images or video recordings created at the time of the alleged incident on May 31, 2013.

92.     Thus, based upon the Cellebrite report, it was evident that COLEMAN's cell phone contained no incriminating evidence, the potential existence of which had provided the Officer Defendants' only purported legal justification for their seizure and search of COLEMAN's cell phone.

93.     In view of these developments, Det. RAMIREZ was obligated to stop his search of the cell phone's contents there.

### Det. Ramirez Conducts a General, Exploratory Search

94.     Yet, Det. RAMIREZ continued to review the cell phone's contents, and opened individual files, including videos clearly labeled with their "created on" date of June 16, 2012—far from the supposed date and time of the alleged incident on May 31, 2013.

95.     Det. RAMIREZ claimed that he elected to review the videos in question because the thumbnail images appeared to depict explicit subject matter.

96.     According to Det. RAMIREZ's later testimony, he believed the videos showed

nothing more than sex between two apparently consenting adults.

97.    Det. RAMIREZ shared the videos with Sgt. HOOTEN and Det. SANTAROSSA, who raised no objections to the exploratory nature of his search.

98.    According to Sgt. HOOTEN's later testimony before the grand jury, she approved of RAMIREZ's search because she wanted to "view the videos to see if there was a crime committed…and see if we could identify the person on the video."

99.    COLEMAN's possession of the videos was not evidence of a crime; however, the Officer Defendants believed otherwise because the subjects depicted in the video appeared to be white, while COLEMAN is black.

<u>Det. Santarossa Procures a Second Warrant Using a False Affidavit</u>

100.    Det. SANTAROSSA applied for second search warrant on June 5, 2013, this time seeking authorization to obtain "all the records and contents of [COLEMAN's] cell phone account" from his service provider, T-Mobile.

101.    Specifically, the warrant demanded production of T-Mobile's information and records for Plaintiff's cell phone account, including:

    a.    Account information to include subscriber name and address…

    b.    Any pictures or videos associated with [the account]…

    c.    Any text messages, Emails or other correspondence associated with [the account]

    d.    File names, sent/received along with dates/times.

    e.    Data content, any and all, present and or not set for deletion.

    f.    Metadata of files sent and received.  Metadata content also if file deleted.

    g.    Billing/payment information.

    h.    Detail records and cell tower locations used by [the cell phone number associated

with Plaintiff's account] between 1400 hours on 05/31/13 to 0200 hours on 06/01/13.

102.    In support of this second warrant application, Det. SANTAROSSA once again prepared an affidavit containing statements he knew to be false, or which he would have known were false had he not recklessly disregarded the truth, and he omitted facts that were material to the determination of probable cause.

103.    Det. SANTAROSSA's material omissions included:

    a.  that S.B. had engaged in intentional revision of her key factual allegations in her successive statements to investigators and other witnesses;

    b.  that the Officer Defendants' search of COLEMAN's cell phone on June 2, 2013 had confirmed the <u>absence</u> of images or videos they speculated may have been created at the time of the alleged incident;

    c.  that that the citizen complainant is a felon who works as a prostitute but claims her activities are limited to "church on Sunday;"

    d.  that Officer Mahon's description of S.B.'s demeanor just before the alleged incident was that her behavior was "erratic" and in her professional opinion that "[S.B.] was under the influence…".

    e.  that the Officer Defendants had obtained transcripts of phone calls between S.B. and her incarcerated boyfriend wherein she appeared to admit that she had lied to cause his arrest for domestic violence, and that her motive was to prevent him from "calling CPS"—suggesting she might be willing to lie to police to cause an innocent person's criminal prosecution;

      f.   that she lied during her taped statement on June 1, 2013 when she was asked to identify all of the people she had told about the alleged incident—omitting her phone call with neighbor Joey Zepeda earlier the same day wherein Zepeda recalls S.B.'s preoccupation with whether she could "get money" if she lodged a complaint.

104.    Yet, Det. SANTAROSSA's warrant application was "approved" by Deputy D.A. LUZAICH, who affixed her signature to its face in the space designated for DA "approval."

105.    Deputy D.A. LUZAICH erroneously advised Det. SANTAROSSA concerning the sufficiency of his affidavit to establish probable cause; and/or, that the proposed warrant he had prepared was sufficiently particularized to satisfy the Fourth Amendment's requirements.

106.    With a prosecutor's stamp of approval, however, Det. SANTAROSSA's application and false affidavit were submitted for review, and the warrant for T-Mobile's records was approved on June 5, 2013.

107.    Upon information and belief, T-Mobile responded to the warrant by providing the information requested, including historical cell phone tower data.

108.    Yet, Det. SANTAROSSA made no further reference to the information and documents he received from T-Mobile.

109.    In the absence of evidence to corroborate the spurious and profit-motivated allegations of S.B. against COLEMAN, the Officer Defendants could not rely upon her statements to establish probable cause for charges against COLEMAN.

110.    When "an *average* citizen reports a crime based upon personal observations…reliability may generally be presumed" and probable cause does not require corroborating evidence. *Ewing v. City of Stockton*, 588 F. 3d 1218, 1225 (9th Cir. 2009) (emphasis added).

111.    However, "[a]n officer should pursue reasonable avenues of investigation and may not close his eyes to facts that would clarify the situation...." *Id.* at 1227 (*quoting McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009)).

112.    Here, the Officer Defendants were aware of facts sufficient to preclude their reliance upon the assumption that S.B. is an "average citizen" whose reliability could be "presumed" for purposes of a probable cause determination.

113.    The Officer Defendants knew from the outset that she was a convicted felon, and that she was regularly involved in prostitution—a contradiction of S.B.'s claim that her activities were limited to "church on Sunday."

114.    Moreover, the Officer Defendants knew that in S.B.'s successive statements to investigators and other witnesses, she revised and embellished key aspects of her narrative—which is apparent upon comparison of her successive interviews with investigators and statements to other witnesses.

115.    On June 2, 2013, Officer Kara Mahon told the Officer Defendants that she had responded to S.B.'s apartment with COLEMAN on May 31, 2013, describing S.B.'s behavior as "erratic" and that "in her professional opinion [S.B.] was under the influence" at the time.

116.    On June 7, 2013, the Officer Defendants interviewed S.B.'s neighbor, Joey Zepeda, who said that S.B. had called him the day of her complaint to discuss whether he thought she could "get money" by accusing an officer of sexual misconduct.

117.    These facts were sufficiently damaging to S.B.'s credibility to cause the Officer Defendants to question her reliability as a witness, precluding reliance upon her uncorroborated statements for the purpose of demonstrating probable cause.

118.    In an effort to save their floundering case against COLEMAN, the Officer

Defendants elected to use the June 16, 2012 videos stored on COLEMAN's cell phone to file additional charges.

119.     Specifically, the Officer Defendants proposed the use of such video to support an offense of violating NRS 200.604, which criminalizes the surreptitious video-recording of a person's private area without that person's consent—a statute that does not, by its own terms, prohibit the recording of a video playing on another person's cell phone to which access has been obtained pursuant to legally-valid consent to search.

120.     Using Cellebrite, which provides the exact date and time the videos were created on COLEMAN's cell phone, the Officer Defendants determined that COLEMAN was on duty at when the videos were created on June 16, 2012.

121.     Using CAD logs, they specifically determined that that the videos had been created while COLEMAN was on a call wherein he arrested a female subject on outstanding warrants.

122.     The Officer Defendants found contact information for the arrestee ("L.M."), who had since been released from custody.

123.     During a taped interview with detectives, L.M., confirmed that the videos in question were hers, and depicted her and her boyfriend filming themselves consensually.

***The Officer Defendants Initiate Coleman's Prosecution without Probable Cause***

124.     Det. SANTAROSSA prepared a Declaration of Summons/Arrest dated July 31, 2013 in which he recommended criminal charges against COLEMAN.

125.     Based upon COLEMAN's use of his cell phone to create video recordings of video playing on L.M.'s cell phone on June 16, 2012, Det. SANTAROSSA recommended charges of:

- Capturing the Image of a Private Area of Another Person, in violation of NRS 200.604, a gross misdemeanor offense.

126.   Based upon the alleged incident on May 31, 2013, Det. SANTAROSSA recommended charges against COLEMAN including:

- Oppression under the Color of Law (with the Threat of Force), in violation of NRS 197.200, a felony offense;

- Open or Gross Lewdness in violation of NRS 201.210.1A, a gross misdemeanor offense.

127.   Det. SANTAROSSA's recommendation that COLEMAN be charged with commission of an alleged felony offense provided the supposed basis for LVMPD to suspend COLEMAN without pay—a fact that the Officer Defendants knew well.

128.   Probable cause for an arrest exists when officers know reasonably trustworthy information sufficient to warrant a prudent person in believing that the accused had committed or was committing an offense.

129.   Here, information contained within the four corners of Det. SANTAROSSA's underlying declaration did not establish probable cause to believe that COLEMAN had committed any of the crimes identified in the declaration.

130.   Probable cause was lacking to charge COLEMAN had violated NRS 200.604, which prohibits the capturing an image of a person's private area(s) without consent, because one of the essential elements of the offense was negated by the fact that L.M. consented to COLEMAN's search of her cell phone without limits as to the scope of his review, as L.M. testified at trial.

131.   Det. SANTAROSSA's declaration falsely suggested, based upon the Officer Defendants' intentionally misleading taped interview of L.M., that she had *not* given consent to COLEMAN to search her cell phone.

– 23 –

132.    In particular, the SANTAROSSA's affidavit contained a description of taped statements L.M. gave to the Officer Defendants where she answered a series of strongly-suggestive leading questions eliciting statements from L.M. that she had not granted consent for COLEMAN's review of her private videos in particular.

133.    Yet, the Officer Defendants were aware that L.M. had granted COLEMAN general consent to COLEMAN to search her cell phone.

134.    The Officer Defendants' efforts to mislead were apparent during L.M.'s testimony at trial where she immediately admitted upon cross examination that she had granted COLEMAN permission to search her phone.

135.    Moreover, probable cause was lacking for this charge because, as the Nevada Supreme Court confirmed in *Coleman v. State*, 134 Nev. Adv. Op. 28 (2018), COLEMAN's conduct of recording a video playing on L.M.'s cell phone was not illegal under NRS 200.604, and an officer's incorrect belief that a criminal statute prohibits certain conduct cannot provide probable cause, regardless of the officer's alleged good faith.

136.    While a citizen witness is generally presumed to be reliable, the Ninth Circuit Court of Appeals has declined to adopt the argument that merely because citizen witnesses are presumptively reliable, officers have no duty to examine further the basis of a witness's knowledge or to talk with other witnesses, if any.

137.    Here, S.B., the citizen complainant who accused COLEMAN of sexual misconduct in an alleged incident on May 31, 2013,

138.    Deputy D.A. LUZAICH filed a criminal complaint in the Las Vegas Justice Court on August 2, 2013, including a felony count of oppression under the color of office "with the threat of force" as Det. SANTAROSSA had specified in his declaration.

139.    A warrant for COLEMAN's arrest was issued based upon the allegations contained in Det. SANTAROSSA's affidavit.

140.    COLEMAN, who by now had retained criminal defense counsel, arranged to surrender in court on August 9, 2013, and was booked into the Clark County Detention Center.

141.    COLEMAN was released from custody only after posting $16,000 bond, upon condition that he remain under house arrest.

142.    At the time of COLEMAN's arrest, and periodically as the criminal proceedings progressed, news media published articles concerning the case.

143.    The sexual offenses which were pasted next to photos of COLEMAN from his appearances in court, were—and remain—highly stigmatizing.

144.    Reports published about the case remain accessible via internet search.

145.    COLEMAN's indictment was further cited in the public record by other litigants seeking ready-made proof of LVMPD's inadequate training and discipline of its officers. *See, e.g., Murnane v. Las Vegas Metropolitan Police Department*, Case No. 2:13-cv-01088-MMD-PAL (D. Nev. Mar. 30, 2015).

### Coleman Ultimately Obtains Favorable Termination of the Criminal Proceedings

146.    Based upon information illegally obtained by the Officer Defendants from their seizure and searches of COLEMAN's personal cell phone, LVMPD's Internal Affairs Bureau ("IAB") accused COLEMAN of alleged employee misconduct.

147.    IAB's case against COLEMAN was instituted on June 2, 2013, one day after S.B. lodged her complaint with the LVMPD.

148.    Following CCDAO's filing of charges, IAB served COLEMAN's attorney with a complaint accusing him of violating the Civil Service Rules and/or LVMPD Procedures.

– 25 –

149.    IAB further served COLEMAN's attorney with notice of his required attendance and cooperation with an IAB interview to be held in early September 2013.

150.    COLEMAN's criminal defense counsel advised him not to participate in an interview regarding the same alleged facts and circumstances underlying the criminal charges that had only weeks earlier been filed—based upon the criminal investigation conducted by a cohort of LVMPD sergeants and detectives.

151.    Based upon COLEMAN's adherence to the advice of his legal counsel, IAB concluded that COLEMAN had engaged in "insubordination," and recommended COLEMAN's immediate termination.

152.    Sheriff Doug Gillespie, LVMPD's final decisionmaker with regards to personnel matters, adopted the recommendation and terminated COLEMAN's employment.

153.    Deputy D.A. LISA LUZAICH elected to dismiss the State's criminal complaint in favor of seeking a grand jury indictment.

154.    LUZAICH presented witnesses on December 5, 2013, and the grand jury returned a true bill the following day, December 6, 2013, charging COLEMAN with six counts:

155.    Counts 1 and 2 in the indictment, including Oppression Under the Color of Office and Illegally Capturing an Image of the Private Area of Another Person, arose from COLEMAN's creation of videos recording videos playing on L.M.'s cell phone on June 16, 2012.

156.    Counts 3 through 6 in the indictment, for gross misdemeanor offenses of Oppression under the Color of Office, Open or Gross Lewdness (two counts), and Indecent Exposure, all arose from the allegations of S.B. concerning the alleged incident on May 31, 2013.

157.    Of significance, Deputy D.A. LUZAICH elected not to seek COLEMAN's indictment on the alleged felony count of Oppression Under Color of Office (with Threat of Force).

an implicit admission that there had never been a valid basis for the felony charge.

158.     COLEMAN was thereafter arraigned in the Eighth Judicial District Court for the State of Nevada in case number C-13-294579-1.

159.     COLEMAN rejected all plea offers by Deputy D.A. LUZAICH.

160.     Ultimately, the case proceeded to a jury trial, which took place beginning on February 29, 2016, and continued over the course of five days.

161.     At trial, COLEMAN testified in his own defense, admitting that he had indeed recorded a video of the videos from L.M.'s cell phone; however, as his counsel argued, such conduct was not violation of NRS 200.604, and the state's novel interpretation of that statute was contrary to its plain meaning.

162.     Further, S.B., the supposed "citizen complainant," was thoroughly impeached, and the jury predictably was unwilling to accept her uncorroborated testimony.

163.     Upon information and belief, LVMPD provided the alleged victim witnesses, S.B. and L.M., with undisclosed benefits in exchange for their testimony, including but not limited to quashing outstanding warrants for their cooperation.

164.     At the conclusion of the trial, on March 4, 2016, the jury found COLEMAN guilty of one count alleged in the indictment—finding that he had violated NRS 200.604 for illegally capturing an image of the private area of another without consent.

165.     On July 20, 2016, the district court entered a judgment of conviction based upon the jury's verdict, and sentenced him to six (6) months confinement in the Clark County Detention Center, suspended, and placed COLEMAN on probation not to exceed two (2) years.

166.     COLEMAN appealed this conviction to the Nevada Supreme Court.

167.     In an opinion published on May 3, 2018, the Nevada Supreme Court reversed

– 27 –

Plaintiff's conviction on the basis that the state's evidence at trial was insufficient to sustain a conviction of under NRS 200.604.

168.    The criminal proceedings thus terminated in COLEMAN's favor.  *See Heck v. Humphrey*, 512 U.S. 477, 489-90 (1994).

169.    Subsequent to issuance of the remittitur, upon remand to district court, the CCDAO at last conceded that it had no further grounds to continue its prosecution of COLEMAN and the case was dismissed.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### § 1983 – Unreasonable Seizure
### (HOOTEN and LEPORE)

170.    Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1 - 169 of this Complaint.

171.    Under 42 U.S.C. § 1983, a person who, acting under color of state law, deprives another person of his federal constitutional rights is liable to the injured party.

172.    Under the Fourth Amendment, enforceable pursuant to 42 U.S.C. § 1983, a person has the right to be free from unreasonable seizure of his property.

173.    Generally, seizures of personal property are unreasonable within the meaning of the Fourth Amendment unless accomplished pursuant to a judicial warrant issued by a neutral and detached magistrate after finding probable cause.

174.    While acting under the color of state law, Sgt. LEPORE deprived COLEMAN of his Fourth Amendment right against unreasonable seizure of his property by intentionally executing a warrantless seizure of COLEMAN's personal cell phone by snatching it directly from his hand and refusing to give it back.

– 28 –

175.    Sgt. LEPORE's seizure of the cell phone was unreasonable because it was not executed pursuant to a judicial warrant; and, he could not reasonably believe that an exception to the warrant requirement (*i.e.*, emergency or exigency) was applicable.

176.    Sgt. LEPORE's seizure of the cell phone also unreasonable because COLEMAN's cell phone was *not* "red"— the only description of the electronic device the complainant claimed COLEMAN "could [have]" used to take surreptitious photos during the alleged incident.

177.    Although Sgt. HOOTEN did not participate directly in the seizure, she set into motion a series of acts by Sgt. LEPORE that she knew, or reasonably should have known, would cause him to deprive COLEMAN of his rights against unreasonable seizure of his property.

178.    HOOTEN's actions demonstrated callous indifference to or disregard for Plaintiff's Constitutional right against unreasonable seizure of his property under the Fourth Amendment.

179.    The Defendants acted with evil motive or intent, and their actions involved reckless or callous indifference to Plaintiff's federally protected rights, warranting punitive damages.

180.    The Defendants' deprivations of COLEMAN's rights have caused him to suffer impairment of his reputation; personal humiliation; and mental anguish and suffering.

181.    The Defendants' deprivations of COLEMAN's rights have necessitated his retention of Nelson Law Office LLC to prosecute this action on his behalf.

### SECOND CAUSE OF ACTION
### § 1983 –Unreasonable Search
### (SHANE and RAMIREZ)

182.    Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1 - 181 of this Complaint.

183.    Under 42 U.S.C. § 1983, a person who, acting under color of state law, deprives another person of his federal constitutional rights is liable to the injured party.

184.    Under the Fourth Amendment, enforceable pursuant to 42 U.S.C. § 1983, a person has the right to be free from an unreasonable search of his personal cell phone.

185.    Here, while acting under the color of state law, Dets. SHANE and RAMIREZ violated COLEMAN's right under the Fourth Amendment to be free from an unreasonable search of his personal cell phone by conducting separate warrantless searches of its contents on June 1st or 2nd, 2013

186.    At the time of these searches, it was clearly established law in the Ninth Circuit that the contents of a person's portable electronic devices, including cell phones, are protected under the Fourth Amendment's specific guarantee of the people's right to be secure in their "papers," and that the warrant requirement applies.

187.    The Defendants acted with evil motive or intent, and their actions involved reckless or callous indifference to Plaintiff's federally protected rights, warranting punitive damages.

188.    The Defendants' deprivations of COLEMAN's rights have caused him to suffer impairment of his reputation; personal humiliation; and mental anguish and suffering.

189.    The Defendants' deprivations of COLEMAN's rights have necessitated his retention of Nelson Law Office LLC to prosecute this action on his behalf.

### THIRD CAUSE OF ACTION
### § 1983 – Judicial Deception
### (HOOTEN, SANTAROSSA, and LUZAICH)

190.    Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1 - 189 of this Complaint.

191.    Under 42 U.S.C. § 1983, a person who, acting under color of state law, deprives another person of his federal constitutional rights is liable to the injured party.

192.    Under the Fourth Amendment, enforceable pursuant to 42 U.S.C. § 1983, a person has the right to be free from an unreasonable search of:

- his cell phone; and/or

- subscriber data in the custody of one's service provider

193.    In general, the search of a person's cell phone and/or subscriber data is unreasonable under the Fourth Amendment unless conducted pursuant to a search warrant.

194.    A search warrant is a written order signed by a judge that permits a law enforcement officer to search a particular location and seize specific items.

195.    To obtain a search warrant, a law enforcement officer must show probable cause that a crime has been committed and that items related to that crime are likely to be found in the place specified in the warrant.

196.    In deciding whether to issue a search warrant, a judge generally relies on the facts stated in a warrant affidavit signed by a law enforcement officer.

197.    Here, while acting under the color of law, Defendants HOOTEN, SANTAROSSA, and LUZAICH deprived COLEMAN of his rights under the Fourth Amendment against unreasonable search of his cell phone, and his account information with T-Mobile by preparing and submitting to judges false search warrant affidavits.

198.    Det. SANTAROSSA's affidavits dated June 2nd and June 5th, 2013, respectively, each contained false statements and omissions material to determination of probable cause.

199.    Warrants would not have been issued if the false information had been excluded (or redacted) and/or if the omitted information had been included (or restored).

– 31 –

200.     Det. SANTAROSSA's false statements and material omissions were made either intentionally or with reckless disregard for the truth.

201.     The Defendants acted with evil motive or intent, and their actions involved reckless or callous indifference to Plaintiff's federally protected rights, warranting punitive damages.

202.     The Defendants' deprivations of COLEMAN's rights have caused him to suffer impairment of his reputation; personal humiliation; and mental anguish and suffering.

203.     The Defendants' deprivations of COLEMAN's rights have necessitated his retention of Nelson Law Office LLC to prosecute this action on his behalf.

**FOURTH CAUSE OF ACTION**
**§ 1983 – Malicious Prosecution**
**(All Officer Defendants)**

204.     Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1 – 203 of this Complaint.

205.     Under 42 U.S.C. § 1983, a person who, acting under color of state law, deprives another person of his federal constitutional rights is liable to the injured party.

206.     The Fourth Amendment, enforceable pursuant to 42 U.S.C. § 1983, prohibits the unreasonable seizure of one's person.

207.     Claims for malicious prosecution alleged unreasonable seizure by use of legal process that is motivated by malice and unsupported by probable cause.

208.     Here, acting under the color of state law, Det. SANTAROSSA sought an arrest warrant and the filing of charges against COLEMAN for which probable cause was lacking.

209.     COLEMAN obtained a favorable termination of the criminal proceeding.

210.   Further, the Officer Defendants prosecuted COLEMAN with the intent to deprive him of his constitutional rights, including, but without limitation:

a.   To equal protection of the law under the Fourteenth Amendment, which prohibits discrimination by police and prosecutors against a person based upon the fact that he is a member of a protected class, which COLEMAN was because he is black;

b.   Against arbitrary deprivation of the benefit of law enforcement's investigative function based upon his membership in a protected class of black citizens in violation of the Equal Protection Clause of the Fourteenth Amendment;

c.   Against government retaliation for the exercise of First Amendment activity, a category within which COLEMAN's agreement to be a witness, if needed, during an anticipated internal investigation of a racist incident, was clearly established. *See, e.g.*, *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986).

d.   Against discrimination in any aspect of employment under Title VII of the Civil Rights Act of 1964, including hiring and firing, compensation, benefits, recruitment, assignments, promotion, discipline, and other terms and conditions of employment.

e.   Against deprivation without due process of COLEMAN's state-created property interest in continued employment as an officer of the LVMPD, which terminated him in conjunction with publication of highly stigmatizing false criminal allegations in the criminal complaint filed against COLEMAN by the CCDAO, against which he was not afforded a meaningful opportunity to defend himself prior to his termination.

211.    The Defendants acted with evil motive or intent, and their actions involved reckless or callous indifference to Plaintiff's federally protected rights, warranting punitive damages.

212.    The Defendants' deprivations of COLEMAN's rights have caused him to suffer impairment of his reputation; personal humiliation; and mental anguish and suffering.

213.    The Defendants' deprivations of COLEMAN's rights have necessitated his retention of Nelson Law Office LLC to prosecute this action on his behalf.

**FIFTH CAUSE OF ACTION**
**§ 1983 – Deliberate Fabrication of Evidence**
**(All Officer Defendants)**

214.    Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1 - 213 of this Complaint.

215.    Under 42 U.S.C. § 1983, a person who, acting under color of state law, deprives another person of his federal constitutional rights is liable to the injured party.

216.    The Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall deprive any person of life, liberty, or property, without due process of law.

217.    Under this provision, i.e., the Due Process Clause, there is a clearly established right not to be subjected to criminal charges based upon false evidence deliberately fabricated by the government.

218.    Here, while acting under the color of state law, the Officer Defendants deprived COLEMAN of his rights under the Fourteenth Amendment by deliberately fabricating false evidence that was used to bring criminal charges against COLEMAN, to prosecute him, and to secure his conviction.

219.   The Officer Defendants' fabrication of false evidence included, but was not necessarily limited to,

    a.   SANTAROSSA's deliberate false statements and material omissions in:

- His affidavit dated June 2, 2013 submitted in support of a search warrant

- His affidavit dated June 5, 2013 submitted in support of a search warrant;

- His warrant/summons declaration dated July 31, 2013 in support of an arrest warrant

    b.   LEPORE's false testimony at a hearing on COLEMAN's motion to suppress and at trial;

    c.   SHANE's false testimony at a hearing on COLEMAN's motion to suppress, and at trial;

    d.   RAMIREZ's false testimony before the grand jury and at trial;

    e.   RAMIREZ's alteration of data in the Cellebrite report he generated on June 2, 2013 cataloguing the contents of COLEMAN's personal cell phone;

    f.   HOOTEN's false testimony before the grand jury and at trial;

220.   The Officer Defendants acted with evil motive or intent, and their actions involved reckless or callous indifference to Plaintiff's federally protected rights, warranting punitive damages.

221.   The Officer Defendants' deprivations of COLEMAN's rights have caused him to suffer impairment of his reputation; personal humiliation; and mental anguish and suffering.

222.   The Officer Defendants' illegal conduct has necessitated COLEMAN's retention of Nelson Law Office LLC to prosecute this action on his behalf.

## SIXTH CAUSE OF ACTION
### § 1983 – *Monell* Liablity
### (LVMPD)

223.     Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1 – 222 of this Complaint.

224.     Under 42 U.S.C. § 1983, a person who, acting under color of state law, deprives another person of his federal constitutional rights is liable to the injured party.

225.     LVMPD, as a political subdivision acting under the color of state law, is a person for the purposes of this § 1983 lawsuit.

226.     LVMPD is subject to "municipal" liability under § 1983 based upon the Officer Defendants' malicious violations of COLEMAN's constitutional rights in accordance with longstanding and widespread custom and practice of permitting white officers to engage in illegal racial discrimination against black citizens and fellow officers.

227.     By their own terms, LVMPD's Procedures and Civil Service Rules required officers to intervene to prevent a colleague's imminent violation(s) of a citizen's constitutional rights, LVMPD's official policy was to the contrary, based upon longstanding, widespread practice of encouraging harsh retaliation against would-be whistleblowers.

228.     LVMPD elected a policy of inaction by virtue doing nothing to prevent future violations of citizens' constitutional rights by officers who engage in discriminatory policing, and retaliation against fellow officers who object to or report such misconduct.

229.     LVMPD's policy resulted from the deliberate choice of its final policymaker, then Sheriff Doug Gillespie, not to do anything meaningful to address racially-biased policing despite "evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded." *Gillette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir.1992).

230.   Such constitutional violations were so persistent and widespread within the department as to practically have the force of law.

231.   LVMPD knew or should have known that such violations by its officers likely would result in violations of COLEMAN's constitutional rights.

232.   LVMPD could have prevented such violations by developing an appropriate policy and training its officers to comply with it.

233.   LVMPD's policies, customs, practices, and/or failure to train amount to deliberate indifference, and these policies, customs, practices, or omissions were the moving force behind the violation of Plaintiffs' constitutional rights.

234.   Resulting deprivations of COLEMAN's rights have caused him to suffer impairment of his reputation; personal humiliation; and mental anguish and suffering.

235.   LVMPD's illegal conduct has necessitated COLEMAN's retention of Nelson Law Office LLC to prosecute this action on his behalf.

//

//

//

//

//

//

//

//

//

//

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against the Defendants as follows:

1.  For general damages according to proof at trial;

2.  For special damages according to proof at trial;

3.  For punitive and exemplary damages according to proof at trial;

4.  An award of attorneys' fees under 42 U.S.C. § 1988;

5.  For costs of suit and prejudgment interest; and,

6.  For such other and further relief deemed appropriate by this Court;

Dated this 24th day of April, 2020.

/s/ Suneel J. Nelson
SUNEEL J. NELSON
Nevada Bar No. 12052
1800 Calle de Vega
Las Vegas, Nevada  89102
(702) 506-1848

*Attorney for Plaintiff Solomon Coleman*
