# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Solomon Coleman,

     Plaintiff

v.

Las Vegas Metropolitan Police Department, et al.,

     Defendants

Case No.: 2:20-cv-00739-JAD-BNW

**Order Granting Defendant's Motion for Summary Judgment in Part, Denying Plaintiff's Motion for Summary Judgment, and Closing Case**

[ECF Nos. 97, 98]

Solomon Coleman was a Las Vegas Metropolitan Police Department (Metro) officer who was internally investigated for on-the-job misconduct in 2013. His cell phone was seized and searched, and images found on it led to his arrest and prosecution for various sex-related crimes. Coleman took the case to trial and was acquitted of all charges save one—and the Nevada Supreme Court reversed his conviction on that remaining offense after finding that the acts he was accused of didn't violate the statute he was convicted under. So Solomon filed this suit against Metro and its sergeants and detectives involved in the investigation, along with the district attorney who handled his prosecution, claiming that their actions violated his constitutional rights.

A motion to dismiss disposed of the claim against Metro and left Fourth and Fourteenth Amendment claims against the individual defendants only. Discovery has closed and all parties crossmove for various relief in motions for summary judgment. Because Coleman never served defendants Cheryl Hooten and Vicente Ramirez, I dismiss them from this suit under Federal Rule of Civil Procedure 4(m). I decline Coleman's request to revive his long-since dismissed claim against Metro because he has not established that reconsideration of that dismissal order is

warranted.  I find that the doctrine of qualified immunity shields Joseph Lepore and Donald Shane from Coleman's Fourth Amendment claims against them, and that the rest of his claims are unsupported by the evidentiary record.  So I grant the defendants' motion in part, deny Coleman's, and close this case.

## Background

### I.    Factual Background

Officer Coleman responded to a domestic-violence call at Sasha Boseke's apartment in May of 2013.[1]  A female officer took photos of injuries on Boseke's arm, elbow, and backside, and Boseke's fiancé was arrested.[2]  At the conclusion of the investigation, Coleman stayed behind to explain the victim's information guide and domestic-violence resources to Boseke and then left.[3]

Exactly what happened next is heavily disputed.  Coleman maintains that he responded to another domestic-violence call in Boseke's neighborhood later that same evening and never went back to Boseke's home.[4]  But Boseke claimed that Coleman came back to her apartment later under the guise of having more paperwork for her and needing to take additional photos of her injuries.[5]  She said that he followed her into her bedroom, pulled down her shorts and underwear,

---

[1] ECF No. 97-4 at 2; ECF No. 97-5 at 16 (52:6–25).  Coleman and the defendants filed compressed versions of deposition transcripts, so four deposition pages are contained in one ECF page. When citing to those documents, I first cite the ECF pagination and then cite the deposition pages and lines in parentheses.

[2] ECF No. 97-5 at 17 (55:18–23); ECF No. 97-6 at 3.

[3] ECF No. 97-4 at 2; ECF No. 97-5 at 17 (56:22–25, 57:17–22); ECF No. 97-6 at 2; ECF No. 97-7 at 243.

[4] ECF No. 97-5 at 19 (65:18–25); ECF No. 97-7 at 221–22.

[5] ECF No. 97-8 at 4–5.

and took photos of her butt while grabbing his groin and commenting on his arousal.[6]  Boseke believed that Coleman returned to her home a third time around midnight, but she didn't answer the door.[7]

### A. Coleman was the subject of an internal investigation into a victim's allegations of improper conduct.

Both sides agree that Boseke called Metro dispatch the next day and lodged a complaint against Coleman.[8]  The call was routed to Sergent Joseph Lepore, who contacted Sergent Cheryl Hooten of Metro's Crimes Against Youth and Family Unit.[9]  Hooten took Detectives Donald Shane and R. Tennant to interview Boseke and, after that interview, Hooten requested that Lepore seize Coleman's cell phone in an attempt to preserve evidence of any photos or videos that Coleman may have taken during the alleged second visit to Boseke's place.[10]

So Lepore called Coleman into a conference room at Metro to explain the allegations against him and take his cell phone.[11]  Shane arrived soon afterwards with orders to bring the phone to Detective Brian Santarossa.[12]  While Lepore, Shane, and Coleman were in the conference room, Coleman's wife called.[13]  Because Coleman was not permitted to access his cell phone, Shane allowed Coleman to call his wife back on Shane's phone instead.[14]  There is a

---

[6] *Id.*

[7] *Id.*

[8] ECF No. 97-9 at 9; ECF No. 97-12 at 16 (50:14–15).

[9] ECF No. 97-35 at 10 (28:19–25).

[10] ECF No. 97-34 at 9 (25:13–17), 10 (27:14–17); ECF No. 97-35 at 10 (29:1–17), 12 (34:7–13, 37:5–8); ECF No. 98-1 at 42 (31:22–25, 32:1–2).

[11] ECF No. 98-1 at 43 (47:12–20).

[12] ECF No. 97-34 at 11 (30:15–22), 16 (52:7–9).

[13] ECF No. 97-5 at 9 (23:20–25).

[14] ECF No. 97-34 at 13 (41:3–6), 14 (44:11–15).

3

dispute about whether Shane accessed Coleman's phone to retrieve the wife's number or Coleman just knew her number from memory.[15]  Either way, Shane eventually took Coleman's cell phone and handed it off to Santarossa.[16]

### B. The internal investigation led to evidence of other alleged misconduct—and Coleman's prosecution for several sex-related crimes involving two alleged victims.

The next day, Santarossa obtained a search warrant for Coleman's cell phone.[17] Detective Vicente Ramirez began the forensic search and was looking for any evidence related to Boseke's accusations.[18]  Santarossa drafted, and Deputy District Attorney Lisa Luzaich approved, an application for a second search warrant three days later to expand the scope of the original search.[19]  Santarossa and Ramirez did not find evidence of Boseke's encounter with Coleman,[20] but they did discover sexually explicit photos and videos of another woman from the previous year.[21]

Back in June 2012, Coleman was on the scene of a suspicious-vehicle call involving a woman named Lauren Morgan.[22]  Coleman conducted a search of Morgan's cell phone and found sexually explicit photos and videos of her.[23]  He took out his phone and recorded that

---

[15] ECF No. 1 at ¶¶ 84–86; ECF No. 97-5 at 9 (24:5–6); ECF No. 97-34 at 14 (44:2–10), 16 (50:2–4).

[16] ECF No. 97-12 at 10 (28:13–16).

[17] ECF No. 97-9 at 13–18; ECF No. 97-12 at 10 (29:21–25).

[18] ECF No. 97-12 at 11 (31:20–22, 33:7), (32:22–25).

[19] ECF No. 97-9 at 8–11.

[20] ECF No. 97-12 at 12.

[21] *Id.* at 13 (40:5–7, 41:5–7).

[22] ECF No. 97-7 at 225, 247.

[23] *Id.* at 229, 231.

content onto his own phone.[24]  It was this content that Santarossa and Ramirez discovered during their search of Coleman's cell phone a year later.

### C.      Coleman ultimately beat the charges.

Coleman was placed on administrative leave shortly after his phone was searched,[25] an internal investigation was opened into this alleged misconduct,[26] and Santarossa applied for a warrant for Coleman's arrest.[27]  By the end of 2013, Coleman had been fired from Metro and was being prosecuted in state court for open and gross lewdness, indecent exposure, capturing an image of the private area of another person, and oppression under color of office.[28]  He twice moved—unsuccessfully—to suppress the evidence found on his cell phone.[29]  When his case was tried, the jury acquitted him of all but the capturing-an-image charge.[30]  But the Supreme Court of Nevada reversed his conviction on that remaining count two years later, concluding that the statute under which Coleman was convicted was being too broadly applied, and Coleman's actions didn't violate it as newly clarified.[31]

## II.      Procedural Background

Absolved of all charges stemming from Metro's internal investigation, Coleman retained counsel, who filed this suit four years ago.[32]  When Coleman's counsel blew extended deadlines

---

[24] *Id.* at 231; ECF No. 97-5 at 16 (50:6–12).

[25] ECF No. 97-16 at 2.

[26] ECF No. 97-18 at 5.

[27] ECF No. 97-10 at 6–17.

[28] ECF No. 97-25 at 2–3; Indictment, *State of Nevada v. Coleman*, No. C-13-294579-1 (Doc No. 1).

[29] ECF No. 97-3 at 12–13; ECF No. 97-11 at 51; ECF No. 97-29; ECF No. 97-30.

[30] Jury Verdict, *State of Nevada v. Coleman*, No. C-13-294579-1 (Doc. No. 31).

[31] *Coleman v. State*, 416 P.3d 238, 241–42 (Nev. 2018).

[32] ECF No. 1.

to respond to the defendants' motion to dismiss the whole case, I construed his lack of response as consent to granting it and closed the case.[33]  I later granted Coleman's pro se motion to reconsider and allowed him to file a belated opposition to the motion to dismiss with new counsel.[34]  But I "caution[ed] that, in light of the history of this case, further missteps will not be overlooked or so freely excused."[35]  After full briefing and oral argument, I granted the motion to dismiss in part, leaving the following claims:

- A Fourth Amendment **unlawful-seizure** claim **against Hooten and Lepore** for the warrantless seizure of Coleman's cell phone;

- A Fourth Amendment **unlawful-search** claim **against Shane** for accessing his cell phone to retrieve Coleman's wife's phone number without a warrant, and **against Ramirez** for looking for more information in the cell phone than the warrant permitted;

- A Fourth Amendment judicial-deception claim **against Hooten, Santarossa, and Luzaich** for "submitting to judges" "false statements and omissions" to establish probable cause for search warrants;

- A Fourth Amendment **malicious-prosecution** claim **against Hooten and Santarossa** for pursuing and initiating charges against Coleman without probable cause and with the intent to deprive him of constitutional rights; and

---

[33] ECF No. 26.

[34] ECF No. 34.

[35] *Id*. at 2.

- A Fourteenth Amendment **fabrication-of-evidence** claim **against Hooten, Lepore, Santarossa, Shane, Tennant, and Ramirez** for false statements and material omissions in warrant applications, testimony, and forensic reports.[36]

Coleman's new counsel eventually withdrew based on "a fundamental disagreement over the appropriate course of action in this matter,"[37] and Coleman moved forward on a pro se basis. Discovery closed eight months ago, and the parties have filed crossmotions for summary judgment, asking for various forms of relief.[38]   Hooten and Ramirez ask to be dismissed because they have yet to be served with process.[39]   The remaining defendants argue that Coleman's Fourth Amendment claims are barred by the doctrine of collateral estoppel because he litigated probable-cause issues in his state-court prosecution and, regardless, the search and arrest warrants were supported by probable cause.  Lepore and Shane add that they are shielded from Coleman's Fourth Amendment claims by the doctrine of qualified immunity.  And all defendants argue that summary judgment is proper on all claims because the record is devoid of evidence to support them.

For his part, Coleman—in an unusually robust filing for a pro se litigant—disagrees with the defendants' characterization of the record and argues that it supports summary judgment in his favor.[40]   He theorizes that the defendants knew he was innocent from the beginning yet continued to investigate and prosecute him.  And he asks the court to revive his long-since-

---

[36] ECF No. 106 (transcript of 9/29/21 motion-to-dismiss hearing).

[37] ECF No. 47 at 2.

[38] Coleman titles his motion as one for partial summary judgment, but I construe it as one for complete summary judgment because he seeks judgment in his favor on all claims.  *See generally* ECF No. 98.

[39] ECF No. 97.

[40] ECF No. 98.

dismissed claim against Metro.  I first address the impact of Coleman's failure to serve Hooten and Ramirez, evaluate his attempt to resurrect his claim against Metro, and then turn to the true summary-judgment issues.

**Discussion**

**I.    Hooten and Ramirez are dismissed from this case because they were never served with process.**

The defendants first seek summary judgment on all of Coleman's claims against Hooten and Ramirez because they have yet to be served with process in this four-year-old case.[41]  I construe this request as one to dismiss the claims against Hooten and Ramirez under Federal Rule of Civil Procedure (FRCP) 4(m), which instructs that the court "must" dismiss claims against any defendant who has not been served with the summons and complaint within 90 days of the complaint's filing or any extension of the service deadline.[42]  Coleman was granted two service extensions and successfully served Lepore, Tennant, Shane, Santarossa, and Metro, but service was not made on Hooten or Ramirez.[43]  Coleman blames this failure on his two previous attorneys and his discovery of this mistake only after he decided to represent himself.[44]  He argues that this constitutes excusable neglect and asserts that because Metro, Hooten, and Ramirez are all represented by the same attorneys and Metro was properly served, Hooten and Ramirez were on sufficient notice of their inclusion in this case.[45]

---

[41] ECF No. 97 at 30–31.

[42] Fed. R. Civ. P. 4(m).

[43] ECF No. 97 at 31.

[44] ECF No. 108 at 10.

[45] *Id.* at 9.

**A.      The law requires good cause to avoid dismissal for failure to serve.**

Service of process on each defendant is a critical step in any litigation.  A court can exercise power over a defendant and make binding decisions about that defendant's rights and obligations only once it obtains jurisdiction over that defendant.  "The procedural requirement of service of summons" is how jurisdiction gets conferred on the court.[46]  "In the absence of proper service of process, the district court has no power to render any judgment against" a defendant.[47] The fact that a named defendant is on notice of a lawsuit is not enough.  As the United States Supreme Court explained in *Omni Capital International, Ltd v. Rudolf Wolff & Company, Ltd*, "before a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant . . . ."[48]

FRCP 4(m) gives a plaintiff 90 days to effectuate service and requires the court to dismiss claims against any defendant not served within that window or any court-granted extension of that deadline[49] unless the plaintiff "shows good cause for [his] failure [to serve]," in which case the court can further extend the service deadline "for an appropriate period."[50] "Good cause to avoid dismissal may be demonstrated by establishing, at a minimum, excusable neglect" and may be supported by a further showing that "the party to be served personally received actual notice of the lawsuit," "the defendant would suffer no prejudice," and the

---

[46] *Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987); *S.E.C. v. Ross*, 504 F.3d 1130, 1138 (9th Cir. 2007) ("service of process is the means by which a court asserts its jurisdiction over the person").

[47] *Ross*, 504 F.3d at 1138–39.

[48] *Id*.

[49] Fed. R. Civ. P. 4(m).

[50] *Id*.

"plaintiff would be severely prejudiced if his complaint were dismissed."[51]  District courts also "have broad discretion to extend time for service" and should "consider factors 'like a statute of limitations bar, prejudice to the defendant, actual notice of a lawsuit, and eventual service.'"[52]

### B.      Coleman has not demonstrated good cause to avoid dismissal of his claims against Hooten and Ramirez.

Coleman has not shown excusable neglect for his failure to serve Hooten or Ramirez. Coleman was granted two extensions to effectuate service on all defendants,[53] and he did so on Metro, Lepore, Shane, Santarossa, Tennant, and Luzaich.[54]  He argues that the incomplete service on Hooten and Ramirez is excusable because it was his attorneys' neglect, not his own.[55] But the law doesn't accept *it was my lawyer's fault* excuses.  As the Ninth Circuit has explained, "[i]t is a longstanding principle that in 'our system of representative litigation, each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.'"[56]  So the fact that the failure to serve Hooten and Ramirez was originally the fault of Coleman's 2020–2022 counsel is not excusable neglect because the law imputes that failure on Coleman, too.

Even if Coleman weren't deemed responsible for his former attorneys' failure, his personal failure to take steps to remedy the lack of service on these defendants during the last 18

---

[51] *Lemoge v. United States*, 587 F.3d 1188, 1198 n.3 (9th Cir. 2009) (quoting *Boudette v. Barnette*, 923 F.2d 754, 756 (9th Cir. 1991)).

[52] *Efaw v. Williams*, 473 F.3d 1038, 1041 (9th Cir. 2007) (quoting *Troxell v. Fedders of N. Am., Inc.*, 160 F.3d 381, 383 (7th Cir. 1998)).

[53] ECF No. 5; ECF No. 13.

[54] ECF Nos. 17–20.

[55] ECF No. 108 at 10.

[56] *Garcia v. I.N.S.*, 222 F.3d 1208, 1209 (9th Cir. 2000) (quoting *Link v. Wabash R.R.*, 370 U.S. 626, 634 (1962)).

months prevents the court from excusing his own neglect.  Coleman discovered the ineffective

service in October 2022 at a meeting with opposing counsel,[57] and he has yet to rectify the

situation by effectuating personal service, moving for another extension, or serving by alternative

means.  So even if the initial failure to serve was his attorneys' fault, Coleman himself knew of

the blunder for a year and a half and did nothing.  Because Coleman has not shown excusable

neglect for his failure to serve Hooten or Ramirez or good cause to further extend his deadline to

do so, this court "must" dismiss the claims against them under Rule 4(m).

**II.     Coleman cannot resurrect his long-since-dismissed *Monell* claim against Metro.**

In his reply in support of his summary-judgment motion, Coleman argues that his claim

against Metro under *Monell v. Department of Social Services of City of New York* "should be

brought in because the claim was prematurely dismissed."[58]  That claim was dismissed two and a

half years ago at the hearing on the defendants' motion to dismiss because Coleman failed to

plead a specific unconstitutional policy, practice, or custom or establish a link between the

defendants' actions and any such policy.[59]  But Coleman requests in his reply brief that I revive

this claim because he was unable to gather the proper documents before discovery to prove a

constitutional violation under *Monell* and, as a pro se plaintiff, he was simply unaware that I

dismissed this claim at the motion-to-dismiss stage.[60]  I liberally construe his argument as a very

late motion for reconsideration.

"[A]s long as a district court has jurisdiction over the case, then it possesses the inherent

procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to

---

[57] *Id.*

[58] ECF No. 107 at 20.

[59] ECF No. 106 at 8–9.

[60] ECF No. 107 at 19–20.

1    be sufficient."[61]  "Reconsideration may also be appropriate if (1) there is newly discovered

2    evidence that was not available when the original motion or response was filed, (2) the court

3    committed clear error or the initial decision was manifestly unjust, or (3) if there is an

4    intervening change in controlling law."[62]  Coleman provides no new evidentiary material that

5    would warrant reviving this claim.  He still fails to highlight a specific policy or custom

6    sufficient to justify *Monell* liability, nor does he point to clear error by the court or a material

7    change in the law.  Indeed, the thrust of Coleman's purported "*Monell*" theory is that the Metro

8    supervisor defendants "*deliberately and maliciously ignored* [Metro's] policies, practices, and

9    procedures in an effort to violate" his constitutional rights,[63] while *Monell* liability against an

10   agency arises when "action *pursuant to*"—not *in contravention of*—"official municipal policy of

11   some nature caused a constitutional tort."[64]  And because the claim against Metro was dismissed

12   more than two and a half years ago, defendants would be prejudiced by its revival at this late

13   date.  So I deny Coleman's request to now revive his *Monell* claim against Metro.

14

**III.    The defendants are entitled to summary judgment in their favor on all
15         remaining claims.**

16          With the claims against Hooten and Ramirez dismissed, and having clarified that no

17   claims against Metro remain, I turn to the true summary-judgment arguments on the remaining

18   claims, which are: the Fourth Amendment claim against Lepore for seizing Coleman's cell

19   phone; the Fourth Amendment unlawful-search claim against Shane for accessing Coleman's

20

---

21   [61] *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 886 (9th Cir.
     2001); *see also* Fed. R. Civ. P. 54(b).

22   [62] L.R. 59–1(a).

23   [63] ECF No. 98 at 28 (emphasis added) (cleaned up).

     [64] *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978).

cell phone to retrieve Coleman's wife's phone number; the Fourth Amendment judicial-deception claim against Santarossa and Luzaich; the Fourth Amendment malicious-prosecution claim against Santarossa; and the Fourteenth Amendment fabrication-of-evidence claim against Lepore, Santarossa, Shane, and Tennant.  While the remaining defendants argue that these claims are barred by qualified immunity or fail because the record lacks evidence to create a genuine issue of fact to support them, Coleman contends that the record supports each of his claims.

### A.   Legal standards for crossmotions for summary judgment

The principal purpose of the summary-judgment procedure is to isolate and dispose of factually unsupported claims or defenses.[65]  Summary judgment is appropriate when the pleadings and admissible evidence "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[66]  The moving party bears the initial responsibility of presenting the basis for its motion and identifying the portions of the record or affidavits that demonstrate the absence of a genuine issue of material fact.[67]  If the moving party satisfies its burden, the burden then shifts to the opposing party to present specific facts that show a genuine issue for trial.[68]

Who bears the burden of proof on the factual issue in question is critical.  When the party moving for summary judgment would bear the burden of proof at trial (typically the plaintiff), he "must come forward with evidence [that] would entitle [him] to a directed verdict if the evidence

---

[65] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[66] *See id*. at 322 (citing Fed. R. Civ. P. 56(c)).

[67] *Id*. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

[68] Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Auvil v. CBS 60 Minutes*, 67 F.3d 816, 819 (9th Cir. 1995).

1   went uncontroverted at trial."[69]   Once the moving party establishes the absence of a genuine

2   issue of fact on each issue material to his case, "the burden then moves to the opposing party,

3   who must present significant probative evidence tending to support its claim or defense."[70]

4   When instead the opposing party would have the burden of proof on a dispositive issue at trial,

5   the moving party (typically the defendant) doesn't have to produce evidence to negate the

6   opponent's claim; it merely has to point out the evidence that shows an absence of a genuine

7   material factual issue on one element of the claim to garner summary judgment on it because "a

8   complete failure of proof concerning an essential element of the nonmoving party's case

9   necessarily renders all other facts immaterial."[71]   "When simultaneous cross-motions for

10   summary judgment on the same claim are before the court, the court must consider the

11   appropriate evidentiary material identified and submitted in support of"—and against—"both

12   motions before ruling on each of them."[72]   Applying these standards, I find that the defendants

13   are entitled to summary judgment on all of them.

### B. The doctrine of qualified immunity shields Lepore and Shane from Coleman's cell-phone-related Fourth Amendment claims.

16       In his first and second causes of action, Coleman claims that his Fourth Amendment

17   rights were violated by Lepore's seizure of his cell phone without a warrant or his consent, and

---

[69] *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992) (citation and quotations omitted)).

[70] *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991) (citation omitted).

[71] *See, e.g., Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990); *Celotex*, 477 U.S. at 322–24.

[72] *Tulalip Tribes of Washington v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citing *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001)).

by Shane's act of searching that phone to retrieve Coleman's wife's phone number so Coleman could call her back on a different phone since his had been seized.[73]   The defendants argue that whether Coleman consented to the seizure and search are genuinely disputed, but that disagreement doesn't matter because these search and seizure claims are barred by the doctrine of qualified immunity because there is no clearly established Fourth Amendment right to privacy in a cell phone used for work purposes.[74]

> **1.    *An officer is immune from suit for a civil-rights violation unless the plaintiff can show that the law made it clear that his conduct was prohibited.***

The doctrine of qualified immunity protects government officials "from money damages unless a plaintiff pleads facts showing that (1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established' at the time of the challenged conduct."[75]   When a defendant raises this affirmative defense, the plaintiff bears the burden of demonstrating that both prongs are met.[76]   The plaintiff's failure to establish either prong compels summary judgment in favor of the defendant on qualified-immunity grounds.

"Public officials are immune from suit under 42 U.S.C. § 1983 unless they have violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."[77]   The right may not be characterized "at a high level of generality."[78]   Instead, "[t]he

---

[73] ECF 1 at 12–14.

[74] ECF No. 97 at 58–59.

[75] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[76] *Isayeva v. Sacramento Sheriff's Dep't.*, 872 F.3d 938, 946 (9th Cir. 2017).

[77] *City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 611 (2015) (quotation omitted).

[78] *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quotation omitted).

dispositive question is whether the violative nature of particular conduct is clearly established."[79] "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent placed the statutory conduct or constitutional question beyond debate."[80]  The takeaway from the Supreme Court's recent qualified-immunity jurisprudence is that a court's analysis of the clearly-established-law prong "must be undertaken in light of the specific context of the case" (like whether Coleman had a privacy interest in his personal cell phone used for work purposes in light of the specific circumstances presented here) "not as a broad general proposition"[81] (like whether a person has a privacy interest in his personal cell phone).

### 2. Coleman has not identified a clearly established Fourth Amendment right that was violated by this search or seizure.

Coleman argues that the clearly established right Lepore and Shane violated was his Fourth Amendment privacy right in his personal cell phone.[82]  Indeed, there is such a clearly established right, as the Supreme Court held ten years ago in *Riley v. California* that people have a Fourth Amendment privacy interest in their cell phones.[83]  But the seizure and search of Coleman's phone happened almost a year before *Riley* was handed down, back when courts were

---

[79] *Id.* (quotation omitted).

[80] *Sheehan*, 135 S. Ct. at 1774 (quotation omitted).

[81] *Id.* at 12 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

[82] ECF No. 98 at 14–15.

[83] *Riley v. California*, 573 U.S. 373, 403 (2014).

widely split on the issue.[84]  So the broad right that Coleman identifies wasn't clearly established at the relevant time.

The right that this court must consider here is even narrower than the generic right to privacy in a cell phone.  This seizure and search occurred because Coleman was using his personal cell phone to gather and store evidence related to his investigatory work as a Metro officer—a fact that Coleman does not deny and which the record overwhelmingly supports.[85]  So the fact-specific question for our qualified-immunity inquiry is whether Coleman had a Fourth Amendment privacy interest in his personal cell phone that was being used for work purposes such that a warrant was required for its seizure or search.

Defendants contend that the law surrounding this workplace-inspection exception to the warrant requirement was not clearly established at the time of these events in 2013—and indeed, still isn't.[86]  The Supreme Court held in a plurality decision in *O'Connor v. Ortega* in 1987 that public employees may have a reduced expectation of privacy in their "offices, desks, and file

---

[84] *See* Elizabeth S. Myers, *Containing Cell Phones? Restoring the Balance Between Privacy and Government Interests in Fourth Amendment Cell Phone Searches and Seizures*, 48 Suffolk U. L. Rev. 203, 215 (2015) ("Before the Supreme Court issued its decision on whether warrantless searches of cell phones are unreasonable, several state and circuit courts struggled with the decision, resulting in a split. . . .  The federal circuit split alone, however, demonstrated that this issue was not completely resolved and required further consideration from our highest Court.").

[85] Coleman testified that he often used his personal cell phone for work purposes while on duty. ECF No. 97-5 at 20 (66:21–25, 67:1–25).  He explained that he has used his phone to record videos of different incidents and investigations.  *Id.*  Most notably, of course, is his encounter with Lauren Morgan in which he viewed sexually explicit photos and videos on Morgan's cell phone and recorded them onto his own.  *Id.* at 15 (49:16–22), 16 (50:9–12).  He testified that Morgan's photos and videos contained proof of drug use and he recorded them for investigatory purposes, believing that he was collecting evidence in accordance with department policy and procedure at the time.  *Id.* at 16 (51:5–17).  He also testified that he freely provided his number to community members so that they might reach him during a potential crisis.  *Id.* at 20 (67:14–23).

[86] ECF No. 97 at 58.

cabinets" "by virtue of actual office practices and procedures."[87]   The *O'Connor* decision yielded two competing approaches for determining whether the workplace-inspection exception applies.[88]   The plurality held that a court first must consider "[t]he operational realities of the workplace" to determine whether the Fourth Amendment is implicated, as "some government offices may be so open to fellow employees or the public that no expectation of privacy is reasonable."[89]   If the court finds that the employee enjoys this expectation of privacy—a determination that must be made on a "case-by-case basis"—it must then address whether the employer's intrusion "for noninvestigatory, work-related purposes, as well as for investigations of work-related misconduct" is reasonable under all the circumstances.[90]   Justice Scalia's concurrence in *O'Connor* dispensed with the operational-realities portion of the test and simply concluded that the government's intrusion must be judged by the standard of reasonableness.[91]

The High Court further refined the workplace-inspection exception in 2010 in *City of Ontario, Cal v. Quon*[92] while considering whether the City of Ontario violated Officer Quon's Fourth Amendment rights when it searched his government-issued pager to determine why Quon was exceeding his monthly character limit, which resulted in additional fees for the city.[93] Although the court declined to issue a broad holding concerning the privacy expectations in

---

[87] *O'Connor v. Ortega*, 480 U.S. 709, 717 (1987).

[88] *See City of Ontario, Cal. v. Quon*, 560 U.S. 746, 756 (2010) (reviewing the Court's disagreement in *O'Connor v. Ortega*).

[89] *O'Connor*, 480 U.S. at 717–18.

[90] *Id.* at 718, 723.

[91] *Id.* at 731 (Scalia, J., concurring)

[92] *Quon*, 560 U.S. at 755.

[93] *Id.* at 750–53.

employer-provided devices[94] or clarify which *O'Connor* test controls,[95] it did assume that Quon maintained an expectation of privacy in the messages he sent on his government-issued pager.[96] But it ultimately concluded that the city's search of that pager was reasonable to uncover whether Quon's overages "were the result of work-related messaging or personal use."[97]  The city's review "was motivated by a legitimate work-related purpose" and "was not excessive in scope," so the High Court found that the search satisfied both tests outlined in *O'Connor* and did not violate Quon's constitutional rights.[98]

The *Quon* case didn't clearly establish the right Coleman needs, however, because Coleman's cell phone was his personal one and not a government-issued device like Quon's. And as the defendants point out, as recently as 2021, the Ninth Circuit observed that "[c]ourts ha[d] not clearly established whether it is unconstitutional to search or seize data from a personal cell phone under the workplace-inspection exception to the warrant requirement for public employers established in" *Ortega* and *Quon*.[99]  So it was not clearly established in 2013 that

---

[94] *Id.* at 760.

[95] *Id.* at 757.

[96] *Id.* at 761.

[97] *Id.*

[98] *Id.* at 764–65.

[99] *Larios v. Lunardi*, 856 F. App'x 704, 705 (9th Cir. 2021) (unpublished) (cleaned up).  The *Larios* panel affirmed a grant of qualified immunity to a California Highway Patrol officer who searched and seized a colleague's personal cell phone during a workplace investigation.  *Id.* Larios had used his personal cell phone to communicate with a confidential informant and eventually became romantically involved with her.  *Larios v. Lunardi*, 442 F. Supp. 3d 1299, 1303 (E.D. Cal. 2020), aff'd, *Larios*, 856 F. App'x at 705.  During the ensuing internal-affairs investigation, his personal cell phone was searched and a backup of its contents was saved.  *Id*. at 1304.  The Ninth Circuit found that the defendant was shielded by qualified immunity because the application of the workplace-investigation exception was not clearly established.  *Larios*, 856 F. App'x at 705 ("We conclude that no clearly established law prohibited the search of Larios's text messages or the creation of a backup of his cell phone data during the course of a workplace investigation.").

1  Coleman had an expectation of privacy in his personal-but-used-for-work cell phone and that

2  Lepore or Shane needed a warrant to seize or search it.  And because Coleman cannot establish

3  that Lepore and Shane violated a clearly established right, these defendants are entitled to

4  summary judgment in their favor on Coleman's Fourth Amendment claims based on qualified

5  immunity.

6      **B.    Santarossa and Luzaich are entitled to summary judgment on Coleman's judicial-deception claim because the record does not establish that falsities or omissions undermined probable cause.**

7

8      In his third cause of action, Coleman claims that Detective Santarossa and Deputy

9  District Attorney Luzaich deceived judges, thereby violating his Fourth Amendment rights, when

10 Santarossa made false statements in and material omissions from his search-warrant applications,

11 and Luzaich tacitly ratified them by submitting the applications to the judges.[100]  To establish a

12 Fourth Amendment judicial-deception claim, "a plaintiff must show that the defendant

13 deliberately or recklessly made false statements or omissions that were material to the finding of

14 probable cause."[101]  To establish materiality, the plaintiff must demonstrate that "the affidavit,

15 once corrected and supplemented, would not have provided a magistrate judge with a substantial

16 basis for finding probable cause."[102]

17

18

19

20

_____

21 [100] ECF No. 1 at ¶¶ 93, 103.  While Coleman also pled this claim against Hooten, I address it only as to Santarossa and Luzaich because the claims against Hooten were dismissed under
22 FRCP 4(m).  *See supra* at pp. 8–11.

23 [101] *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004) (citing *Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002)).

[102] *Chism v. Washington State*, 661 F.3d 380, 389 (9th Cir. 2011) (cleaned up).

   **1.**  ***This claim is not precluded by the probable-cause finding at Coleman's preliminary hearing.***

  The defendants argue that Coleman cannot prevail on his judicial-deception claim because the state court in Coleman's criminal case "heard evidence regarding [his] unsupported allegations that Santarossa lied and fabricated false affidavits and rejected those arguments," finding probable cause.[103]  They contend that, under the Ninth Circuit's decision in *Haupt v. Dillard*,[104] the preliminary-hearing probable-cause finding is conclusive and collaterally estops Coleman from pursuing this judicial-deception claim.[105]  But *Haupt* is no longer good law because, after it was decided, the Nevada Supreme Court held that "a probable cause determination in a preliminary hearing does not preclude a plaintiff from litigating that issue in a subsequent suit."[106]  So, as the Ninth Circuit then held in *Scafidi v. Las Vegas Metropolitan Police Department,* a "preliminary-hearing probable-cause determination is [now] only prima facie evidence of probable cause, which can be overcome in a later proceeding with evidence of 'false testimony or suppressed facts.'"[107]

---

[103] ECF No. 105 at 22.  *See also* ECF No. 97-3 at 12 (transcript of state-court suppression hearing) ("The Court finds that there was a search warrant obtained that was based upon probable cause signed by a neutral and detached magistrate and executed in good faith.").

[104] *Haupt v. Dillard*, 17 F.3d 285 (9th Cir. 1994).

[105] *Id*.

[106] *Jordan v. State ex rel. Dep't of Motor Vehicles & Pub. Safety*, 110 P.3d 30, 48 (Nev. 2005), overruled on other grounds by *Buzz Stew, LLC v. City of N. Las Vegas*, 181 P.3d 670 (Nev. 2008)).

[107] *Scafidi v. Las Vegas Metro. Police Dep't,* 966 F.3d 960, 963 (9th Cir. 2020) (cleaned up) (quoting *Jordan*, 110 P.3d at 48–49).

**2.**     ***Coleman has not shown that he can overcome the prima facie evidence of probable cause.***

Defendants contend that Coleman "does not even articulate" in his briefing "the actual, alleged deception" that supports his judicial-deception claim.[108]  Indeed, his theories are mostly broad and vague.  He opines that "the inaccuracies of the statements made by [Boseke] regarding [him], the lack of witnesses, lack of evidence, and credibility of a convicted felon and known prostitute" mean that "a 'prudent person' would not have concluded there was" probable cause.[109]  He adds his characterization of Santarossa's affidavit as "written in a way to deceive the magistrate judge into believing the seizure along with the search of the cell phone" hadn't yet happened.[110]  And he notes that when Santarossa was asked at deposition "do you believe [Boseke] was truthful during her interview" in 2013, Santarossa responded, "I don't know."[111]

Starting with the last point, Santarossa's deposition answer is not evidence of judicial deception.  For one thing, the timing is off.  The fact that Santarossa didn't know at his 2023 deposition whether Boseke was truthful ten years earlier is proof of nothing.  Plus, his follow-up deposition answer undermines any assumption that Santarossa believed Boseke was untruthful when he applied for the search warrant.  As Santarossa explained, "[t]here was no evidence to say she wasn't, there was not evidence to say that she definitely was.  I don't know."[112]

Coleman doesn't identify what statements in either search-warrant affidavit make them "written in a way to deceive the magistrate judge" into thinking that the phone hadn't yet been

---

[108] ECF No. 105 at 21.

[109] ECF No. 98 at 20.

[110] ECF No. 107 at 14.

[111] ECF No. 98 at 19 (quoting ECF No. 98-1 at 69).

[112] ECF No. 98-1 at 69 (Santarossa depo. at 72:10–13).

seized or searched, and the affidavits belie that characterization.  The June 2, 2013, Application and Affidavit for Search Warrant notes that on June 1, 2013, the phone had been obtained from Coleman and was in Metro's possession "for safekeeping pending this investigation."[113]  The June 5, 2013, application recounts that Detective Ramirez, "a certified cell phone investigator, conducted an examination of Coleman's cell phone and discovered browser activity related to several web-based photo sharing accounts."[114]

The remaining alleged omissions don't undermine a probable-cause finding either. Coleman's generalization that probable cause is destroyed by "the inaccuracies of the statements made by [Boseke] regarding [him]" is too vague to show that he can overcome the prima facie evidence supplied by the state-court's probable-cause determination.  "Conclusory allegations unsupported by factual data cannot defeat summary judgment,"[115] "[n]or can a party defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements."[116]  Because Coleman's claim of inaccuracies is conclusory, it doesn't overcome the prima facie probable-cause evidence.

Nor did "the lack of witnesses [or] lack of evidence" mean that probable cause didn't exist.  As the United States Supreme Court emphasized in *Illinois v. Gates*, "probable cause means 'fair probability,' not certainty or even a preponderance of the evidence.  In short, a magistrate judge is only required to answer the 'commonsense, practical question whether there is probable cause to believe that contraband or evidence is located in a particular place' before

---

[113] ECF No. 98-1 at 75.

[114] ECF No. 97-9 at 11 (cleaned up).  These affidavits contain much of the same information. *Compare* ECF No. 97-9 at 8–11 *with id*. at 14–18.

[115] *Rivera v. Nat'l R.R. Passenger Corp*., 331 F.3d 1074, 1078 (9th Cir. 2003).

[116] *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003) (cleaned up).

issuing a search warrant."[117]   Corroboration was not required to establish probable cause here either, as the Ninth Circuit has recognized that crime victims "may generally be presumed credible by police"[118] and that non-informant, citizen witnesses "are generally presumed reliable."[119]

Even without that presumption, Boseke's account was sufficiently reliable to establish probable cause that Coleman had committed a crime and that evidence of it would be found on his phone.  A court may judge the reliability of a citizen's report of a crime by considering "(1) the opportunity to view the criminal at the time of the crime; (2) the degree of attention paid to the criminal; (3) the accuracy of the prior descriptions of the criminal; (4) the level of certainty demonstrated at the time of confrontation; and (5) the length of time between the crime and the confrontation."[120]   These factors establish the reliability of Boseke's report.

Boseke positively identified Coleman as the officer who was first dispatched to her home for a domestic-violence incident and who later returned to her home alone—twice.[121]   Coleman spent almost two hours at her home, remaining there alone with her for roughly 35 minutes after all the other officers had left.[122]   Boseke had ample opportunity to interact with him, making it conceivable that she would recognize him upon his alleged return later that evening.  She identified him to officers as the "mixed policeman," and Santarossa notes in his affidavit that

---

[117] *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 230, 246 (1983)).

[118] *Ewing v. City of Stockton*, 588 F.3d 1218, 1225 (9th Cir. 2009) (quoting *United States v. Blount*, 123 F.3d 831, 835 (5th Cir. 1997)).

[119] *Id*. at 1224.

[120] *Grant v. City of Long Beach*, 315 F.3d 1081, 1087 (9th Cir. 2002) (cleaned up), *opinion amended on denial of reh'g*, 334 F.3d 795 (9th Cir. 2003).

[121] ECF No. 97-9 at 10, 17.

[122] ECF No. 97-4 at 2.

Boseke referred to him by name as "Coleman."[123]  She also called to report Coleman the very next morning while the events of the preceding evening would have remained fresh in her memory.[124]  The details Boseke provided of the alleged second encounter show that she both paid—and was able to pay—a high degree of attention to the alleged perpetrator.  At no time did her account reflect that she was uncertain about what happened—except as to whether he actually took photos with his cell phone, and to that point, the affidavit reflects that Boseke recounted that Coleman "pull[ed] out a red cell phone from his pocket" and that "she believed that he had taken pictures of her while her pants were down."[125]  All of this information sufficiently established a fair probability that evidence of this encounter would be found on Coleman's cell phone.

Probable cause was also not negated by Santarossa's failure to note that Boseke was "a convicted felon and known prostitute."[126]  "The government need not include all of the information in its possession to obtain a search warrant.  The omission of facts rises to the level of misrepresentation only if the omitted facts 'cast doubt on the existence of probable cause.'"[127] For the proposition that Santarossa knew but omitted these details of Boseke's past, Coleman offers a patchwork of deposition excerpts in which Santarossa acknowledges that Boseke's neighbor, Joey Zepeda, told Santarossa (on an unidentified date) that "he believed Boseke was a prostitute" and that "Boseke's friends are people who do drugs, cheat, and are hookers."[128]  But

---

[123] ECF No. 97-9 at 10; ECF No. 108-1 at 29.

[124] ECF No. 97-9 at 9; ECF No. 97-12 at 16 (50:14–15).

[125] ECF No. 98-1 at 75.

[126] ECF No. 98 at 20.

[127] *Ewing*, 588 F.3d at 1226 (quoting *United States v. Johns*, 948 F.2d 599, 606 (9th Cir. 1991)).

[128] ECF No. 98-1 at 70 (when asked if Boseke was "a known prostitute," Santarossa testified, "I believe she had priors also for it").

it is not clear from the record that Zepeda shared these colorful impressions with Santarossa before the affidavits were sworn out.  Even if he had, this alleged history would not have prevented the judge from finding probable cause in light of the totality of the circumstances— particularly the detailed information Boseke provided about the encounter and Coleman's alleged use of his phone during it.  This absence of a genuine issue of material fact to support Coleman's judicial-deception claim entitles Santarossa and Luzaich to summary judgment in their favor.[129]

### C.  For the same reason, Santarossa is entitled to summary judgment on Coleman's malicious-prosecution claim.

Coleman's fourth cause of action alleges a Fourth Amendment malicious-prosecution claim under 28 U.S.C. § 1983 against Santarossa for seeking and obtaining "an arrest warrant and the filing of charges against Coleman for which probable cause was lacking."[130]  To prevail on such a claim, Coleman must establish that the charges against him were "instituted without any probable cause," that the motive behind them "was malicious," and "the criminal prosecution ended without a conviction."[131]  My conclusion that Coleman cannot show on this record that probable cause was lacking also entitles Santarossa to summary judgment on his

---

[129] As an independent basis for summary judgment, the defendants argue, and Coleman does not refute, that Santarossa and Luzaich would be shielded from judicial-deception liability based on qualified immunity.  Indeed, Coleman does not even attempt to establish that the unlawfulness of applying for search warrants on these facts was clearly established.  So even if there were genuine issues of fact surrounding the probable-cause determination, the defendants are entitled to qualified immunity.  *See Ewing*, 588 F.3d at 1231.

[130] Although this claim was pled against "All Officer Defendants," ECF No. 1 at 32, I granted the motion to dismiss this claim against Lepore, Shane, and Tennant, leaving it to proceed against Santarossa and Hooten.  *See* ECF No. 106 at 9.  Because all claims are dismissed against Hooten under FRCP 4(m), I now evaluate this claim against Santarossa only.

[131] *Thompson v. Clark*, 596 U.S. 36, 44, 49 (2022).

Fourth Amendment malicious-prosecution claim.  "It is a long-standing principle of common law that a decision by a judge or magistrate to hold a defendant to answer after a preliminary hearing constitutes prima facie—but not conclusive—evidence of probable cause."[132]  Although Coleman ultimately beat all of his charges, the grand jury did return a true bill on six of them,[133] which is prima facie evidence of probable cause.  That, coupled with my finding that Boseke's report of the incident and the totality of the circumstances were sufficient to establish probable cause to believe that Coleman had committed a crime,[134] means that Coleman cannot establish a key element of this claim.  So I grant summary judgment in favor of the defendants on Coleman's malicious-prosecution claim, too.[135]

> ### D.    Summary judgment is warranted on Coleman's evidence-fabrication claim because the record does not support it.

In his final cause of action, Coleman claims that Santarossa, Lepore, Shane, and Tennant violated his Fourteenth Amendment due-process rights by "deliberately fabricating false evidence that was used to bring criminal charges against [him], to prosecute him, and to secure his conviction."[136]  Deliberate fabrication requires proof of fabrication and evidence of

---

[132] *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004); *see also Jordan,* 110 P.3d at 49 n. 65 (citing *Ricord v. C.P.R.R. Co.,* 15 Nev. 167, 180 (1880), for the proposition that, in a malicious prosecution case, the commitment and indictment of a defendant constitutes prima facie—but rebuttable—evidence of probable cause for criminal prosecution).

[133] ECF No. 1 at ¶ 154.

[134] *See supra* at pp. 21–25.

[135] Like the judicial-deception claim, this claim would also be subject to dismissal based on qualified immunity because Coleman has not shown that the unlawfulness of his prosecution on these facts was clearly established.

[136] ECF No. 1 at 34–35.

causation.[137]  A plaintiff can establish fabrication with direct evidence of deliberate fabrication or circumstantial evidence of a defendant's motive.[138]  If a plaintiff relies on circumstantial evidence, he must show that the "(1) [d]efendants continued their investigation . . . despite the fact that they knew or should have known that [the plaintiff] was innocent; or (2) [d]efendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information."[139]  Evidence that a defendant knew or should have known that the plaintiff was innocent is not required if there is direct evidence of deliberate fabrication.[140]

The defendants argue that Coleman can't establish on this record that they fabricated evidence against him.[141]  Coleman responds by blanketly referring back to the same allegations he offered in support of his judicial-deception and malicious-prosecution claims.[142]  He adds more specifically that "Santarossa's affidavit contained statements he knew to be false, or which he would have known were false had he not recklessly disregarded the truth," and he refers again to Santarossa's "admi[ssion]" in his deposition that he didn't know if Boseke's report was true.[143]  As further proof that the defendants knew Boseke's allegations were false, Coleman

---

[137] *Caldwell v. City & Cnty. of San Francisco*, 889 F.3d 1105, 1112, 1115 (9th Cir. 2018); *Richards v. Cnty. of San Bernardino*, 39 F.4th 562, 573–74 (9th Cir. 2022) (noting that claims for deliberate fabrication of evidence require a less demanding causation standard, requiring that the plaintiff show that there is a reasonable likelihood that the alleged fabrication "could have affected the judgment of the jury").

[138] *Caldwell*, 889 F.3d at 1112.

[139] *Devereaux*, 263 F.3d at 1076.

[140] *Spencer v. Peters*, 857 F.3d 789, 799–800 (9th Cir. 2017).

[141] ECF No. 97 at 51–53.

[142] ECF No. 108 at 34 (citing ECF No. 98 at 20).

[143] *Id*.

references "Hooten's email communication where she admitted that no evidence regarding 'their victim' had been recovered from [his] phone."[144]  He contends that Tennant is on the hook for this claim because he "conducted multiple interviews with individuals from [Coleman's] personal cell phone contacts that were not relevant to the alleged criminal investigation regarding Sasha Boseke" and didn't "speak[] up about the unwarranted interviews. . . ."[145]  And he insists that the defendants' "techniques were coercive and abusive to lead to false information" because they "unlawfully seized" and searched his cell phone and "ignored the fact that there was no evidence to support the claim that came in from Boseke."[146]

To begin with, none of this even mentions Lepore or Shane—let alone supports a claim of deliberate fabrication by them—so they are both entitled to summary judgment in their favor.[147]  Coleman's theory against Tennant does not rise to the level of conduct necessary to create a genuine issue of fact to support this claim against him either.  The interviews Coleman

---

[144] *Id*. (citing ECF No. 98 ("Exhibit C, pg. 31 ¶ 6")).  Exhibit C to Coleman's motion is actually a series of emails about his right to arbitration.  The Hooten email Coleman is referring to is found at ECF No. 98-1 at 98 and marked as "Exhibit M."

[145] ECF No. 108 at 12.

[146] *Id*. at 34–35.

[147] Coleman offers the conclusory argument that these officers "were part of a group effort, led by the Sexual Assault detail who predetermined Plaintiff's guilt, then used every means available, including violating Plaintiff's rights under the clearly established law, to ensure his prosecution and conviction on charges for which probable cause did not exist."  ECF No. 98 at 23.  He adds that they "deprived" him "of his rights under the Fourteenth Amendment by deliberately fabricating false evidence that was used to bring criminal charges against" him, "to prosecute him, and to secure his conviction." *Id*. at 25.  Instead of identifying in his briefing this "false evidence," he refers the court to his complaint at pages 14–15.  *Id*.  But Coleman's complaint is not verified, and a party opposing summary judgment "cannot defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements."  *Hernandez*, 343 F.3d at 1112.  And to the extent that this claim against Lepore and Shane is based on false testimony at a hearing, *see* ECF No. 1 at ¶ 219(b)-(f), it is also barred by absolute immunity.  *See Paine v. City of Lompoc*, 265 F.3d 975, 981 (9th Cir. 2001) ("Witnesses, including police witnesses, are immune from liability for their testimony in earlier proceedings even if they committed perjury.") (citing *Briscoe v. LaHue*, 460 U.S. 325, 329 (1983)).

cites are described in voluntary statements by Boseke and were conducted by Shane on June 1 and June 7, 2013; Tennant was present at the second one.[148]  But Coleman doesn't identify anything in those interviews of Boseke that shows that Tennant or Shane fabricated anything or conducted those interviews despite knowing that Coleman was blameless.  Nor does he identify anything about those interviews that shows the use of investigative techniques that would yield false information.  So Tennant, too, is entitled to summary judgment on this claim.

While Coleman points to some evidence against Santarossa, that evidence doesn't create a genuine issue of fact that precludes summary judgment in his favor on this claim.  The Hooten email is dated June 6, 2013—the day after Santarossa's second search-warrant affidavit was sworn out—and there is no evidence in the record that it was sent to or seen by Santarossa.  Even if it was, that email shows only that the search of Coleman's phone didn't yield any photos to corroborate Boseke's story and leaves open the possibility that a further search might:

> As Lt. had stated in the last email[,] we have not found pictures of our victim regarding this incident.  However, there are other photos and video that we are looking into.  We are also waiting for the T Mobile account (Search Warrant) to see if anything has been stored elsewhere.[149]

Construed in the light most favorable to Coleman, the Hooten email is not proof that Santarossa fabricated evidence or continued to investigate Coleman though he knew or should have known that he was innocent.  Indeed, by then—as the Hooten email itself notes—the investigators had discovered the sexually explicit images of Morgan on Coleman's phone, which were the images on which Coleman was eventually convicted at trial (a conviction that was reversed on appeal on legal, not factual grounds).

---

[148] ECF No. 108-1 at 28–30 (Boseke's voluntary statements).

[149] ECF No. 98-1 at 98.

Coleman's assertion that Santarossa's affidavit was rife with statements he "knew to be false" or would have "had he not recklessly disregarded the truth"[150] is too conclusory to stave off summary judgment. Besides, as I found supra, the record does not support Coleman's characterization of Santarossa's search-warrant affidavits as containing falsities or material omissions. And while Santarossa admitted at his deposition that he didn't know whether Boseke's story was truthful or not, his candid acknowledgement of that skepticism—which is a truism for any alleged victim—is a neutral fact; it is not proof that Santarossa knew or should have known that Coleman was innocent of the crimes he was ultimately charged with.

Coleman's labeling of the department's techniques used in his internal investigation as so "coercive and abusive [as] to lead to false information"[151] is bluster. As explained supra, he has not shown that the seizure and initial search of his cell phone were not permitted by the workplace-inspection exception to the warrant requirement.[152] Nor has he established that the warranted searches of his phone lacked probable cause or were overbroad. While Boseke's complaint against Coleman was not corroborated, as an alleged citizen-victim, her allegations were worthy of the presumption of truth.[153] And when the investigative team soon stumbled upon the images of Morgan, Boseke's claim that she believed Coleman had taken explicit pictures of her became more plausible. So the techniques Coleman identifies weren't coercive or abusive. Even if they were, Coleman has not explained how their design was likely to generate false information. For example, he does not argue that the forensic report of his cell phone was

---

[150] ECF No. 108 at 34.

[151] *Id.*

[152] *See supra* at pp. 15–20.

[153] *See supra* at p. 24.

fabricated in any way, nor does he contend that the Morgan images were fake or somehow planted on his cell phone to incriminate him.

In sum, I find that Coleman has not shown that he can support his evidence-fabrication claim with either direct evidence of falsification or circumstantial evidence that the defendants continued to investigate him though they knew or should have known he was innocent or they used techniques so coercive and abusive that they knew or should have known that their means would yield false evidence.  So I grant summary judgment in favor of the defendants on Coleman's evidence-fabrication claim.

## Conclusion

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment **[ECF No. 97] is GRANTED in part**, leaving no claims remaining[154]:

- The claims against Hooten and Ramirez are DISMISSED under FRCP 4(m);

- Lepore and Shane are entitled to summary judgment on Coleman's Fourth Amendment claims based on qualified immunity; and

- All remaining defendants are entitled to summary judgment on all remaining claims because the failure of proof on at least one element of each claim leaves Coleman without the necessary genuine issues of fact to proceed to trial on any claim.

IT IS FURTHER ORDERED that Plaintiff Solomon Coleman's motion for summary judgment **[ECF No. 98] is DENIED**.

---

[154] Because I grant summary judgment for the reasons stated in this order, I need not and do not address the defendants' additional arguments for resolution in their favor.

The Clerk of Court is directed to **ENTER JUDGMENT** in favor of the defendants and against Plaintiff Solomon Coleman and **CLOSE THIS CASE**.

_____
U.S. District Judge Jennifer A. Dorsey
April 19, 2024